HUGH MAXWELL, PLAINTIFF IN ERROR, *v.* NATHANIEL L. GRISWOLD, GEORGE GRISWOLD, GEORGE W. GRAY, AND GEORGE GRISWOLD, JUNIOR.

The points ruled in the preceding case of Greely *v.* Thompson and Forman adopted and applied to this case also, so far as they are applicable.

Where the collector insisted upon either having the goods appraised at the value at the time of shipment, the consequence of which would have been an addition of so much to the invoice price as to subject the importer to a penalty; or to allow the importer voluntarily to make the addition to the invoice price and so escape the penalty, and the importer chose the latter course, this was not such a voluntary payment of duties on his part as to debar him from bringing an action against the collector for the recovery of the excess thus illegally exacted.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the Southern District of New York.

Like the preceding case of Greely *v.* Thompson and Forman, it was an action brought by the defendants in error against Maxwell, the collector at the port of New York, for the return of duties paid under protest.

In January, 1850, the defendants in error imported into New York, in the ship Matilda, from Manilla, sundry bags of sugar and bales of hemp. The goods were purchased in March and April, 1849, but not shipped until about the 24th of July, 1849, when the market prices had risen very considerably. The assistant appraiser reported upon the value of the articles, meaning by the word *value* "the actual market value at the time of shipment to the United States in the principal markets of the country of produce."

The importers paid the duties under protests, one of which was the following.

*Protest Notice.*

"*New York, January* 3*d,* 1850.

"H. MAXWELL, ESQ., *Collector :* —

"We hereby protest against the duties demanded from us by the collector on this importation of plantain bark, or hemp.

"One objection is, that the duties, contrary to law and justice, are assessed upon a greater value than the cost of the same when purchased for us for shipment to the United States; the true costs and charges, being the value in the foreign market (Manilla), at the time when purchased for shipment, amount to $38,197.95, say thirty-eight thousand one hundred and ninety-seven $\frac{95}{100}$ dollars. We are required to pay duties upon an estimated and fictitious value, amounting, with charges, &c., to $47,662.95, and we are compelled to enter the goods at their estimated and fictitious value to save penalties and forfeitures, and to get possession of our property.

"We protest against being committed to any thing by the form of the entry, which we submit to upon compulsion, insisting that they are not according to the truths of the transactions. The sixteenth section of the tariff law of 1842 fixes the date of purchase for shipment as the time in reference to which the value is to be ascertained, except in the case of goods imported into the United States from some country other than that of the growth or manufacture of the imported articles. There is nothing in the eighth section, or any part of the tariff act of 1846, nor in any other law of the United States, inconsistent with the sixteenth section of the act of 1842.

"We give notice that we intend to seek redress by suit at law and otherwise, as we may be advised, for the wrong done to us in respect to the excessive duty imposed upon this importation.

"We rely upon the objection we have made, and upon such other objections founded in law and in fact as belong to the case, and we now offer to specify them to the collector, more particularly if requested so to do.

"The sum of money now illegally extorted from us, over and above the true and honest duties, is $2,366.25, more or less, being 25 per cent. on the valuation over and above actual cost, as specified in the invoice herewith produced.

W. G.
B.

"True copy.                                                   S. P. R.

"NATH'L L. & GEO. GRISWOLD."

Upon the trial of the cause a bill of exceptions was taken,

which it is not deemed advisable to set forth *in extenso,* because it contained all the invoices, entries, depositions, and circulars from the Secretary of the Treasury, the whole amounting to nearly thirty printed pages. The following summary of the bill will be sufficient.

*Southern District of New York,* ss.

Be it remembered, that on the 13th day of June, in the year 1850, as yet of the stated term of the said court, commencing on the first Monday of April, in the year 1850, held at the City Hall, in the city of New York, in the Southern District of New York, before the Hon: Samuel Nelson, Associate Justice of the Supreme Court of the United States, sitting in the said Circuit Court, the issue within contained joined between the said Nathaniel L. Griswold, George Griswold, George W. Gray, and George Griswold, junior, plaintiffs, and Hugh Maxwell, defendant, came on to be tried, and the said parties, by their respective attorneys, before the said justice came; and the jurors of the jury in this behalf duly summoned also came; and to say the truth also in this behalf are elected, tried, and sworn.

And the counsel for the said plaintiffs, to maintain and prove the said issue in their behalf, produced and gave in evidence the invoices, entries, and protests, in the words and figures following: —

(Then followed the invoices, entries, and protests, the entries showing that the appraisers had added to the amount " to make value at time of shipment.")

And proved that said protests were made and delivered to the defendant at and before the payment of the duties on the goods in said invoice and entries contained, and that the sum of $ 12,493.50 was paid by the plaintiffs to the defendants on the 8th day of January, 1850, as duties on the plantain bark named in said foregoing entry thereof, of which amount $ 2,425.50 was duty on the sum of $ 9,702, added with commissions in said entry as therein expressed, " to make market value of bark "; and on the 15th day of the same month the plaintiffs paid to the defendant the further sum of $ 5,091, as duties on the sugar named in said foregoing entry thereof, of which amount $ 615 was duty on the sum of $ 2,050, added with commissions in said last-mentioned entry as therein expressed, " to make value at time of shipment."

And further to maintain and prove said issue on their part, the counsel for said plaintiffs called the following witnesses, who, being severally duly sworn, testified as follows, that is to say: — -

(Then followed the depositions of several witnesses, show-

ing the purchases at Manilla, and that the prices were the regular market prices at the time of purchase.)

The plaintiff's counsel, further to maintain and prove said issue on their part, produced and gave in evidence certain circulars of the Secretary of the Treasury, in the words and figures following, viz. : —

(Then followed a series of circulars from the Secretaries of the Treasury, beginning with the year 1833, and coming down to October, 1849, being nineteen printed pages.)

The plaintiff's counsel, further to maintain and prove said issue on their part, called the following witnesses, who, being severally duly sworn, testified as follows.

A. B. Mead testified that he was assistant appraiser from about the fall of 1846 to the fall of 1849, and during that time had the almost exclusive charge of appraising iron and other metals, " and that, under the instructions of the Secretary of the Treasury, the examiners and appraisers at the port of New York have in all cases been required, under the provisions of the tariffs of 1842 and 1846, to ascertain, and appraise, and report, the wholesale market values of all merchandise in the principal markets of the country of production or manufacture, at the period of the exportation of the merchandise to the United States, and not at the period of the purchase or production of the merchandise in the country whence imported, and that such has been the uniform practice up to this time, so far as known to the deponent."

G. F. Thompson testified that he was assistant appraiser of the port of New York from 1844 to June, 1848, and that, under the instructions of the Secretary of the Treasury, the examiners and appraisers at the port of New York have in all cases been required, under the provisions of the tariffs of 1842 and 1846, to ascertain, and appraise, and report, the wholesale market values of all merchandise in the principal markets of the country of production or manufacture, at the period of the exportation of the merchandise to the United States, and not at the period of the purchase or production of the merchandise in the country whence imported, and that such has been the uniform practice up to this time, so far as known to the deponent.

Samuel J. Willis testified that he was one of the principal appraisers at the port of New York from the year 1844 to July, 1849, and that, under the instructions of the Secretary of the Treasury, the examiners and appraisers of the port of New York have in all cases been required, under the provisions of the tariffs of 1842 and 1846, to ascertain and appraise and report, the wholesale market values of all merchandise in the

principal markets of the country of production or manufacture, at the period of the exportation of the merchandise in the country whence imported, and that such has been the uniform practice up to this time, so far as known to the deponent.

The counsel for said plaintiffs then rested, and the counsel for said defendant thereupon insisted and prayed the court to charge and instruct the jury, as matter of law, as follows: —

1. That the payment made in this case by the plaintiffs to the defendant was a voluntary, and not a coercive payment; and so that the plaintiffs could not maintain their action; that the evidence showed that the collector had been entirely passive in this whole matter, and had done no act, and made no demand, which compelled the plaintiffs to pay the entire amount, which they did pay upon their own advisement; that the collector merely received the sum tendered to him by the plaintiffs, and never made the payment a condition precedent to the delivery of the goods, nor threatened to raise the valuation expressed on the face of the invoice; all that was done was done by the plaintiffs themselves voluntarily, without the least coercion or action on the part of the defendant, and that the verdict should therefore be in his favor.

2. That the acts done by the collector were all done in obedience to written instructions made by circulars addressed by the Secretary of the Treasury to the collector (which are set out in schedule Z, annexed to this case), and in compliance with the acts of Congress therein referred to.

That these instructions had all the authority of law, so far as the collector was concerned, and he could not disobey them. That all the money received by the collector in this case was collected by him in obedience to law, and paid immediately into the Treasury of the United States under a like compulsion, and that the collector could not be made liable to refund any part of this money to the plaintiffs, even although the construction put upon the revenue laws by the Secretary of the Treasury may have been erroneous.

That the act of Congress approved February 26th, 1845, entitled "An Act explanatory of an Act making appropriations for the civil and diplomatic expenses of government for the year one thousand eight hundred and thirty-nine," did not apply to this case the defendant being compelled, by laws passed by Congress subsequently to that year, to pay over without delay into the Treasury of the United States all moneys received by him as collector, and that by authority of the case of Carey *v.* Curtiss (reported in the third of Hammond's Reports, page 236) the defendant could not be made liable in this action.

3. That there was no error in the proceedings at the custom-

house, the valuation there made being the true valuation according to law, and hence this action could not be maintained.

Whereupon the court then and there charged and instructed the jury, that by law duties were only to be assessed upon the actual market value of the said plantain bark, or hemp, and sugar, at the time of their purchase by the plaintiffs, and not upon such market value at the time of their shipment by them ; and that the payment of duties by the plaintiffs upon the increased amount, being the difference between such market value at the time of shipment and at the time of purchase, was, on the part of the plaintiffs, a payment by coercion, and having been accompanied with the protest, the plaintiffs were entitled to a verdict for the sum paid as duties on such increased amount, with interest thereon from the date of its payment; that the fact that the defendant, in taking duties upon the market value of the merchandise at the time of shipment, had acted in obedience to the circular instructions to that effect from the Secretary of the Treasury, did not render such mode of assessment of duties legal, or preclude the plaintiffs from recovering the excess paid by them above the duties upon the market value of the merchandise at the time of its purchase. And the court further refused to charge or instruct the jury in conformity with the points insisted upon by the defendant's counsel, and in conformity with which he had prayed the court to charge and instruct the jury as aforesaid.

And the counsel for said defendant then and there excepted to the said charge of the court, and to the refusal of the court to charge the jury in conformity with which the said counsel had so prayed the court to charge the jury, as aforesaid.

And thereupon the jurors of the jury aforesaid found a verdict for the plaintiffs for three thousand two hundred and six dollars and forty-four cents.

And because the said several matters so offered and given in evidence, and the matters insisted upon by the said defendant, and the decision of the said court, and the charge of the said court, and the said exceptions taken to the same, do not appear by the record of the verdict aforesaid, the said defendant has caused the same to be written on this bill of exceptions, to be annexed to said record, and has prayed the said justice, holding the said court, to set his hand and seal to the same. Whereupon the said the honorable Samuel Nelson, the associate justice before whom the said issue was tried, and the said exceptions were taken, has hereto set his hand and seal, this 2d day of January, in the year 1851.

S. NELSON. [L. S.]

Upon this bill of exception, the case came up to this court.

It was argued by *Mr. Crittenden* (Attorney-General), for the plaintiff in error, and *Mr. J. S. McCulloh,* for the defendants in error.

For *Mr. Crittenden's* argument, see the preceding case of Greely *v.* Thompson and Forman.

*Mr. McCulloh* made the following points : —

I. The duties were exacted by coercion and duress, and were not a voluntary payment without condition or reserve.

II. The right to maintain this action under the act of 26th February, 1845, is not impaired or taken away by laws or circulars of a date prior or subsequent thereto.

III. The dutiable value of the merchandise was illegally estimated and appraised by the appraisers and collector, at the market prices of the period of shipment, and their acts, being illegal thereon, are not conclusive on the importer, but are null and void.

1. The payment was coercive and by duress, and not voluntary and without reserve.

The sovereignty of the United States has, as its incident, the power to prohibit imports and lay impost duties, and in the exercise thereof has appointed officers to execute its regulations.

Boarding officers are to search and seal boxes, &c. Act of 1799, c. 22, § 97. Masters and mates are fined $1000 for allowing merchandise to be landed without permit and in open day (1799, c. 22, § 27), and merchandise so landed is forfeited (1799, c. 22, §§ 27, 50).

The collector and naval officers are to estimate the duties in gross, and indorse the amount on entry (1799, c. 22, § 21, 49), and no permit to land is granted until this amount is paid (1799, c. 22, § 62), and a bond for redelivery of the merchandise on demand of the collector is executed according to the act of 1830, c. 147, § 8 (4 Stat. at Large, 411.)

The entry, which is to be made before the goods are landed (1799, c. 22, §§ 21, 27, &c.), is to be sworn to by the importer, and on it he has to make the additions, which, by § 8 of the tariff act of 1846, are authorized in the cases of purchased goods; and if the additions are not then made, the Secretary of the Treasury refuses to relieve under the act of 1797, March 3d, from any penalty that may be inflicted where the appraisers put up the value (see Circular of Secretary of the Treasury, 11th June, 1849), and in remitting the penalty, only the half of the United States would be returned, if the residue shall have

been distributed among the officers of the customs (Circular, 25th May, 1845).

The Circular of 6th July, 1847, had expressly directed all appraisements to be based on the market values at time of shipment, instead of the time of purchase, and under this and the subsequent circulars the importers would inevitably have suffered the penalty, had they not raised their invoice-purchase prices to the market values of shipment.

Upon suspicion by the collector of intended fraud in stating the value, or otherwise, the importer is liable, after entry, to have the goods seized (Act of 1842, c. 270, § 21, 5 Stat. at Large, 565; 1799, c. 22, §§ 66, 67; Rankin v. Hoyt, 4 Howard, 333); and if the importer succeeds in establishing his good faith, he still cannot recover from the United States the costs expended by him. See 3 Howard, 252, opinion of Justice Story; Shaw v. Woodcock, 7 Barn. & Cres. 73, 84; Irving v. Wilson, 4 T. R. 485; Snowdon v. Davis, 1 Taunt. 358.

2. The right to maintain this action, under the act of 26th February, 1845, c. 22 (5 Stat. at Large, 729), is not impaired or taken away by laws and circulars of a date prior or subsequent thereto.

The power given to the Secretary of the Treasury, under §§ 23, 24 of the tariff act of 1842, to establish "regulations not inconsistent with the laws of the United States," to secure just and impartial appraisals of goods, is a special and very guarded power, and is but a repetition of former similar provisions. Act of 1832, c. 227, § 9 (4 Stat. at Large, 592).

The collector who exacts duties under instructions inconsistent with the law, cannot plead in defence an act of a superior, which in itself is null and void. See Opinions of Attorneys-General, 1015.

The personal inconvenience of the collector is not to be considered. Tracey v. Swartwout, 10 Peters, 98.

The act of 1839, March 3d, § 2, was in effect but the reiteration of former provisions of law (1799, c. 22, § 21, 1 Stat. at Large, 644); nor is there any act subsequent to 1839 that overrules the act of February 26th, 1845.

The second clause of the act of 26th February, 1845, provides for the maintaining of actions and trials by jury for subsequent extortions, and any enactment to repeal this provision must be wholly repugnant to and inconsistent with it, or the two laws must consist together as part of an entire system; and the courts will jealously restrict the construction of laws exempting officers from responsibility for oppression in the exercise of powers which tend to produce fines and penalties

(Jones *v.* Estis, 2 Johns. 379), which derogate from the common law (19 Vin. Abr. 524, § 125; 4 Hill, 76, 92), which derogate from the rights of property (Smith *v.* Spooner, 3 Pick. 230), and the illegal exercise of which has always been held to subject officers to recompense the damages arising therefrom. The Mariana Flora, 11 Wheat. 1; Ripley *v.* Gelston, 9 Johns. 302; Gossly *v.* Barlow, 1 Anstruther, 23; Bostock *v.* Saunders, 2 Black. 912.

It is to be observed that this exaction is made under the general regulations issued by the Secretary of the Treasury, under § 23 of the tariff act of 1842, and not by a special decision, under the twenty-fourth section of said act.

3. In support of the point that the appraisement on the market value of shipment was illegal, and the acts of the officers based thereon were nullities, the following authorities are relied upon.

Under the revenue laws passed prior to 1823, the assessment of merchandise subject to *ad valorem* duties was based on its "actual cost, in labor and materials," and not on its actual market value. Ninety-five Bales *v.* United States, 1 Paine's C. C. 149; 1789, c. 5, § 22 (1 Stat. at Large, 42); Tappan *v.* United States, 2 Mason's C. C. R. 402; 1790, c. 35, § 46 (Ibid. 169); Tappan *v.* United States, 11 Wheat. 419; 1799, c. 22, § 66 (Ibid. 677); Act of 1818, c. 79, § 79 (3 Stat. at Large, 435.)

By the subsequent laws the assessment was based on the actual wholesale market value of the goods. Acts of 1823, c. 21, §§ 4, 5, 8, 13, 15 (3 Stat. at Large, 732, 733, 734, 735); 1828, c. 55, § 8 (4 Stat. at Large, 273); 1830, c. 147, § 4 (Ibid. 410); 1832, c. 227, § 7 (Ibid. 591); 1842, c. 270, § 16 (5 Stat. at Large, 503).

By the acts of 1823, c. 21, §§ 5, 13, 16 (3 Stat. at Large, 733, 735), and 1842, c. 270, §§ 16, 17 (5 Stat. at Large, 563, 564), the actual wholesale market values, in the chief markets of the country of production, are to be estimated and ascertained at the time of the purchase of the goods, except that, in case the importation is from a country other than that of the original production, then the values are to be found as of the time of the exportation to the United States; and by the act of 1846, c. 74, § 8 (Pamphlet Laws, 69), the rules prescribed by then existing laws are reënacted in regard to merchandise subsequently imported.

The value so to be ascertained is the "net," "prime," "wholesale price," after deduction of discounts, bounties, and drawbacks; Act of 1823, c. 21, §§ 5, 16 (3 Stat. at Large, 732, 735); Act of 1842, c. 270, § 16 (5 Stat. at Large, 563); and after allowance for "depreciation" in the "foreign moneys" in

which these values are required to be expressed. Act of 1799, c. 22, §§ 36, 61 (1 Stat. at Large, 655, 673) ; Act of 1789, c. 5, § 13 (1 Stat. at Large, 39) ; Act of 1801, c. 28, § 2 (2 Stat. at Large, 121).

The argument of the plaintiffs in error is, that the " proviso " of § 16 of the tariff act of 1842 (5 Stat. at Large, 563) overrules or repeals the body of that section, as to the time of ascertaining the market values. (See Treasury Circular of 6th July, 1847.)

But this view has not been maintained even by the Treasury Department, (see Cir. 9th September, 1846,) and that it is erroneous is evident, because the proviso contemplates an importation from " a country other than that of production," whilst the purview of the section refers to an importation " from the country of original production."

The general object of a " proviso " is to qualify or restrain the generality of the " purview " of an act. Minis *v.* United States, 15 Peters, 445. And where the " proviso " may operate as a separate and substantive clause in itself, differently from the rest of the enactment, it must be so construed. Rex *v.* Harris, 4 T. R. 202 ; Rex *v.* Robinson, 2 Burr. 799 ; The Emily & Caroline, 9 Wheaton, 381.

In Churchill *v.* Crane, 2 M. & P. 415, it was held that where a general intent is expressed, and then a special intent, the last is an exception.

To repeal the " body " of an enactment by the " proviso " requires that it be wholly repugnant to the " purview." 1 Kent Com. 462. The substitution of one enactment for another must be entire and repugnant, in order to repeal by implication. See United States *v.* Heth, 3 Cranch, 399 ; Goodenow *v.* Butterick, 7 Mass. 141. And clauses that are repugnant to a law and the system are held to be null in order to sustain the general provisions. Mendon *v.* County of Worcester, 10 Pick. 235.

It has been adjudged by the Circuit Court of the United States for Massachusetts, in the case of Thompson and Forman *v.* Greely, decided in October, 1850, that by the acts of 1823, c. 21, §§ 5, 8, 13, 16, and 1842, c. 270, § 16, the appraisement of merchandise is to be made " if actually bought as of the time of purchase, and if imported for account of the producer or manufacturer, at the time when manufactured or produced." So held in Grinnell *v.* Lawrence, Ct. Ct. U. S. New York. The estimation and appraisal, therefore, to be final and conclusive on the importer, must have been made in strict compliance with the requirements of law.

In Rankin *v.* Hoyt, 4 How. 327, which was a case of suspicion of fraud, the court say that the appraisers are a sort of

legal referees under the act of 1830, c. 147, § 8, and are to be presumed, in the absence of evidence to the contrary, to have done their duty. But it is to be observed that the execution of a special power is not final and conclusive, whoever the actor may be, unless the requirements of law be accurately fulfilled.

The exercise of a delegated discretion cannot exceed the power given (Schell *v.* Bridgewater Manuf. Co., 24 Pick. 296), although the burden of showing this excess or departure from the trust delegated is thrown on the importer (see Tappan *v.* United States, 2 Mason, 406, 407 ; 11 Wheaton, 419), the presumption of law being in favor of the validity of acts done until impeached. Rankin *v.* Hoyt, 4 Howard, 327.

By an appraisement as of the time of shipment, no other future steps can remedy the illegality, and the provisions of § 17 of the tariff act of 1842 (5 S at. at Large, 574) do not make any appraisement final and conclusive, unless the merchant neglects or refuses to furnish proof or answer interrogatories, or unless the collector having by writing notice of the dissatisfaction of the importer, has a merchant appraisement conformably to law. Such steps were taken by the collector in the cases reported in 2 Mason, and 4 Howard, 327.

The fluctuation of the markets in foreign countries makes the period when the value is estimated a matter of substance, and is of far more importance than the non-compliance with requirements of form alone, which have been adjudged sufficient to destroy the validity of acts, and subject the actors to damages in suits at law when executing specially delegated powers or summary proceedings, the performance of which must be strictly carried out, because they tend to produce fines and penalties, to derogate from the common law, and from the rights of property, and to appropriate private property to public use, which, being contrary to natural right and justice, is only tolerated in cases of necessity, and upon full compensation. Const. U. S., Art. 5 of Amendments ; The Mariana Flora, 11 Wheat. 1 ; Bradshaw *v.* Rogers, 20 Johns. 103.

These principles have been recognized in cases of sales under the internal tax laws of the United States, of July 14, 1798 (Parker *v.* Rule, 9 Cranch, 44 ; Williams *v.* Payton's Lessee, 4 Wheat. 77) ; — in sales for taxes under State laws (Sharp *v.* Spear, 4 Hill, 76 ; Thayer *v.* Stearns, 1 Pick. 404 ; McClung *v.* Ross, 5 Wheat. 116) ; — in proceedings of courts of limited and summary powers (Thatcher *v.* Powell et al., 6 Wheat. 119; State *v.* Merryman, 7 Har. & Johns. 79 ; Ellicott *v.* Levy Court, 1 Har. & Johns. 359) ; — in searching houses by excise officers, under 10 George I. c. 10, §§ 12, 13 (Bostock *v.* Saunders,

2 Black. 912) ; — in proceedings by collectors of customs, in seizures under slave-trade acts (Opinions of Attorneys-General, 227) ; — in refusing credits for duties under the Act of 1799, c. 22 (Olney *v.* Arnold, 3 Dall. 308) ; — in refusing clearance of vessels without payment of tonnage dues (Ripley *v.* Gelston, 9 Johns. 202) ; — in summary powers of masters of vessels in forfeiting seamen's wages (Cloutman *v.* Tennison, 1 Sumn. 381) ; — in proceedings of the Secretary of the Treasury (Opinions of Attorneys-General, 1015) ; — in proceedings of navy officers (Gossly *v.* Barlow, 1 Anstruther, 23) ; — and in proceedings by officers of the army (Harmony *v.* Mitchell, tried at Circuit Court of N. Y., Sept. 1850).

The power of the collector to make appraisements of foreign merchandise is a summary and special power, and it was extended from time to time, to apply to other and additional instances, until finally it was made applicable to all cases.

It was originally applied to cases of imports without an invoice; Acts of 1789, c. 5, § 16 (1 Stat. at Large, 41); 1790, c. 35, § 37 (Ibid. 166) ; 1799, c. 22, §§ 52, 66 (Ibid. 665, 671) ; to imports suspected to be fraudulent, or invoiced in fraud; Acts of 1789, c. 5, § 22 (1 Stat. at Large, 42); 1790, c. 35, § 66 (Ibid. 175); 1799, c. 22, §§ 66, 67 (Ibid. 677) ; to goods damaged on the voyage of importation ; Acts of 1789, c. 5, § 16 (1 Stat. at Large, 41); 1790, c. 35, § 37 (Ibid. 166); 1799, c. 22, § 52 (Ibid. 665).

These appraisements were made by two merchants, one chosen by the collector, the other by the importer; but afterwards, by the acts of 1818, c. 79, § 9 (3 Stat. at Large, 435), and 1823, c. 21, § 16 (Ibid. 735), the President was to appoint persons who should, " whenever directed by the collector," make the appraisements " he required."

By the acts of 1818, c. 79, § 11 (3 Stat. at Large, 436), and 1823, c. 21, §§ 13, 12, 15 (Ibid. 734, 735), penalties were imposed on " goods suspected to be fraudulently invoiced, and raised by the appraisers."

By the act of 1828, c. 55, § 9 (4 Stat. at Large, 274), all goods were directed to be appraised, and by the acts of 1830, c. 147, § 3 (4 Stat. at Large, 409), 1832, c. 227, § 7 (Ibid. 591), 1842, c. 270, § 16 (5 Stat. at Large, 563), all goods were to be appraised by the collector.

The power to review appraisements was, under the act of 1823, c. 21, §§ 18, 19, 21 (3 Stat. at Large, 736), by two merchants acting with the two United States appraisers; under act of 1818, c. 79, § 9 (3 Stat. at Large, 435), by two United States appraisers and one appointed by the importer ; under acts of 1832, c. 227, § 8 (4 Stat at Large, 592), and 1830, c. 147, § 3 (Ibid. 409), by one appraiser appointed by the collector, and

one by the importer, who was to make oath as prescribed, &c. Rankin v. Hoyt, 4 How. 327. And under the act of 1842, c. 270, § 17, by two merchant appraisers appointed by the collector.

The act of 1842 thus repeals the provision of 1830 and 1832, by prescribing a different mode of revision.

Giving power to one person expressly to do a thing, excludes all others. Lyon v. Jerome, 26 Wend. 485. And substituting provisions on the same subject, is a virtual repeal of the former provisions. United States v. Heth, 2 Cranch, 399; Gage v. Currier, 4 Pick. 399; Davis v. Fairburn, 3 How. 636.

In addition to these enactments, there are others which answer any argument founded on supposed necessity to make the time of shipment the period of valuation of the merchandise. The importer must produce a sworn invoice of cost; Act of 1823, c. 21, § 4 (3 Stat. at Large, 731); and must enter by it; Act of 1799, c. 22, § 36 (1 Stat. at Large, 655). The Secretary of the Treasury can "require testimony" in such manner as he deems proper; Act of 1823, c. 21, § 18 (3 Stat. at Large, 736); "can establish rules to secure fair, impartial appraisals"; Acts of 1832, c. 227, § 9 (4 Stat. at Large, 592), and 1842, c. 270, § 23 (5 Stat. at Large, 566); can require a bond from the importer, to produce, in a specified time, such proof as the Secretary of the Treasury may demand. Act of 1830, c. 147, § 8 (4 Stat. at Large, 411).

There is therefore no reason, under the present revenue laws, for turning the power of appraisal into an engine of oppressive extortion against American merchants engaged in foreign commerce, whose transactions are open to the world.

Mr. Justice WOODBURY delivered the opinion of the court.

This case presents two points, similar to what have just been decided in Greely v. Thompson et al. In respect to the first one, which related to the proper time for fixing the value of goods imported from the country of their growth or manufacture, this court there held it was the time of their procurement when not purchased, and the time of their purchase when they had been actually purchased abroad, rather than the time of their exportation or shipment. The goods in this case were valued at the latter time, though they had been previously purchased, and at a lower price. For the reasons assigned in the other case, the instruction given that this time was wrong, must be considered legal.

Another point decided in Greely v. Thompson et al., and which is a ground of exception here, was, that though the money was collected in obedience to orders from the Treasury

Department, which the collector, so far as regards the Department, was bound to follow, yet this did not justify him as to others, or bar a recovery by third persons if not liable in law to pay so high duties. For the reasons there assigned, this exception is likewise one which cannot be sustained.

The other points in that case do not arise here, but one does arise which did not exist there, and which we now proceed to examine.

The importer had put in his invoice the price actually paid for the goods, with charges, and proposed to enter them at the value thus fixed. But the collector concluded in that event to have them appraised, and the value would then, by instructions and usage at New York, be ascertained as at the time of the shipment, which was considerably higher, and would probably subject the importer, not only to pay more duties, but to suffer a penalty.

The importer protested against this, but in order to avoid the penalty, under such a wrong appraisal, adopted the following course.

This being a case of purchase of goods abroad, and not procurement, it came clearly within the eighth section of the act of 1846, and therefore the importer, as that act permits, was allowed to make, and did make, an addition to his invoice, so as to escape the penalty, by means of the addition, and the payment of the consequent increased duties. (Pamphlet Laws for 1846, p. 69.)

This increase of duties, thus obtained, the present action is instituted to recover back, they having been paid under protest and unwillingly. The government, however, insist that this excess of duties was caused and paid voluntarily, and hence, though illegal, cannot be recovered back. If they were paid voluntarily, some precedents would seem to countenance the inability to sustain this suit. Elliot *v.* Swartwout, 10 Peters, 137.

But the gist of the point is, were these increased duties in truth paid voluntarily, in the meaning of that term as applicable to the present subject? We have already seen, that the importer did not at first propose to enter his goods of such a value as to justify these increased duties. On the contrary, he insisted on entering them at only the price for which he purchased them, with charges, and thus agreeing with his original invoice, while the collector virtually insisted on having them appraised at their increased value as at the time of the shipment, such being the usage in the custom-house at New York, and such the requirement of the circular of the Secretary of the Treasury, November 24th, 1846. The importer, knowing that

this would subject him to a severe penalty, in order to avoid it, felt compelled to add to his invoice the amount which the price had risen between the purchase and the shipment.

But this addition and consequent payment of the higher duties were so far from voluntary in him, that he accompanied them with remonstrances against being thus coerced to do the act in order to escape a greater evil, and accompanied the payment with a protest against the legality of the course pursued towards him.

Now, it can hardly be meant in this class of cases, that, to make a payment involuntary, it should be by actual violence, or any physical duress. It suffices, if the payment is caused on the one part by an illegal demand, and made on the other part reluctantly and in consequence of that illegality, and without being able to regain possession of his property except by submitting to the payment. (See cases cited hereafter.)

All these requisites existed here. We have already decided, that the demand for such an increased appraisal was illegal. The appraisal itself, as made, was illegal. The raising of the invoice was thus caused by these illegalities in order to escape a greater burden in the penalty. The payment of the increased duties thus caused was wrongfully imposed on the importer, and was submitted to merely as a choice of evils.

He was unwilling to pay either the excess of duties or the penalty, and must be considered, therefore, as forced into one or the other by the collector, *colore officii*, through the invalid and illegal course pursued in having the appraisal made of the value at the wrong period, however well meant may have been the views of the collector.

The money was thus obtained by a moral duress, not justified by law, and which was not submitted to by the importer, except to regain possession of his property withheld from him on grounds manifestly wrong. Indeed, it seems sufficient to sustain the action, whether under the act of February 26th, 1845, or under principles of the common law, if the duties exacted were not legal, and were demanded and were paid under protest. 5 Stat. at Large, 727; Clinton *v.* Strong, 9 Johns. 370; 11 Wheaton; 1 Miller, 536; 1 Bos. & Pul. 139; Irving *v.* Chitsowdt, 4 D. & E. 485, 553; Cowp. 69, 805.

All these circumstances existed here, and hence the judgment below must be affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of New York, and was argued by counsel. On

consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs and damages, at the rate of six per centum per annum.