GULBENKIAN et al. v. UNITED STATES.

(Circuit Court, S. D. New York. December 28, 1909.)

1. CUSTOMS DUTIES (§ 82*)—DURESS—VOLUNTARY ACT.
   Importers so changed the form of invoicing as to increase the amount of duty payable, this being done to comply with a rule which had been established by the Board of General Appraisers, but which the courts subsequently held illegal. *Held*, that as the action of the importers had been without protest and the customs officers had not raised or changed the invoices, nor directed or requested that to be done, there had been no legal compulsion or duress.
   [Ed. Note.—For other cases, see Customs Duties, Dec. Dig. § 82.*]

2. CUSTOMS DUTIES (§ 105*)—VOLUNTARY PAYMENT—MISTAKE OF LAW.
   Where excessive customs duties are paid under a mistake of law and without protest, the payment is voluntary, and there can be no recovery.
   [Ed. Note.—For other cases, see Customs Duties, Cent. Dig. §§ 233–241; Dec. Dig. § 105.*]

3. CUSTOMS DUTIES (§ 111*)—FINALITY OF ASSESSMENT—STATUTE OF LIMITATIONS.
   Act June 22, 1874, c. 391, § 21, 18 Stat. 190 (U. S. Comp. St. 1901, p. 1986), making the settlement of duties "final and conclusive upon all parties," after the expiration of one year, applies to actions to recover from the government alleged excessive or illegal duties.
   [Ed. Note.—For other cases, see Customs Duties, Dec. Dig. § 111.*]

4. CUSTOMS DUTIES (§ 101*)—CHANGE IN CUSTOMS PRACTICE WITHOUT NOTICE—FRAUD.
   Under Act June 22, 1874, c. 391, § 21, 18 Stat. 190 (U. S. Comp. St. 1901, p. 1986), making the settlement of duties final in the absence of "fraud," it was not fraud by the government, where subordinate customs officers, without notice to importers or instructions from their superior officers, made a change in the method of assessing duties, after years of uniform practice.
   [Ed. Note.—For other cases, see Customs Duties, Dec. Dig. § 101.*]

5. CUSTOMS DUTIES (§ 82*)—PROTEST—ORAL COMPLAINT.
   With no protest other than an oral complaint, importers acquiesced in a customs ruling that involved an increase in the duties on their goods. *Held*, that there had not been such a "protest" as is contemplated by Act June 22, 1874, c. 391, § 21, 18 Stat. 190 (U. S. Comp. St. 1901, p. 1986), making the settlement of duties final "in the absence of protest."
   [Ed. Note.—For other cases, see Customs Duties, Dec. Dig. § 82.*]

6. CUSTOMS DUTIES (§ 105*)—RECOVERY OF DUTIES—REMEDY—COURT OF CLAIMS.
   Where importers had failed to proceed for the recovery of excessive duties by filing protests, and thus securing a decision by the Board of General Appraisers, as provided by Customs Administrative Act June

10, 1890, c. 407, § 14, 26 Stat. 136 (U. S. Comp. St. 1901, p. 1933), they are precluded from recovery in the Circuit Court as a court of claims under Tucker Act March 3, 1887, c. 359, 24 Stat. 505 (U. S. Comp. St. 1901, p. 752).

[Ed. Note.—For other cases, see Customs Duties, Dec. Dig. § 105.*]

7. CUSTOMS DUTIES (§ 17*)—ESTOPPEL—LONG CONTINUED PRACTICE.
    Years of illegal practice in classifying goods and assessing the duties thereon does not bar the United States from changing to the legal method.
    [Ed. Note.—For other cases, see Customs Duties, Dec. Dig. § 17.*]

8. CUSTOMS DUTIES (§ 17*)—CHANGE OF DUTIES—NOTICE TO IMPORTER.
    Where the government changes its method of assessing duties, it is under no obligation to give notice to importers in advance of actual importation.
    [Ed. Note.—For other cases, see Customs Duties, Dec. Dig. § 17.*]

At Law. Proceedings to recover excessive duties, being an action or proceeding under the so-called Tucker act (Act March 3, 1887), conferring concurrent jurisdiction with the Court of Claims on the Circuit Court of the United States in certain cases.

Hatch & Clute (Walter F. Welch, of counsel), for claimants.

Henry A. Wise, U. S. Atty. (William L. Wemple, Asst. U. S. Atty. of counsel).

RAY, District Judge. The petition was filed on or about July 20, 1908, and the claimants seek to recover $8,755.47, the amount of alleged illegal duties assessed by the United States on certain importations of wools by reason of an alleged improper and illegal mode of invoicing forced on the claimants, and paid by them between November 9, 1904, and January 14, 1905. Claimants base their alleged right of action on an implied promise to repay the excess duties.

For eight or more years prior to September 28, 1903, the claimants had imported wool into the United States from Bagdad, Turkey, Ottoman Empire, for sale to merchants in regular course of business, making contracts of sale in many cases in advance of importation. These wools, grown there, exist in mixed lots when placed on the Bagdad market; the whites and other colors being commingled. The claimants here have always purchased their wools in these mixed lots in which shape wools there are always, so far as appears, placed on the market. The whites, after being sorted and separated from the other colors, would be worth more than the other colors in the Bagdad market if sold in that way. After purchase at Bagdad, the claimants then sort the wools, separating the whites from the other colors, and putting them in separate bales. In this condition they are imported into the United States. The invoices place the same value, the purchase price, on the entire lot, whites and browns, although the whites in Bagdad as well as here, after being assorted, are actually worth more as stated. This cost price in Bagdad and placed in the invoices has been less than 12 cents per pound, so that the duties assessed and paid up to the time hereafter mentioned have been the same on the whites as on the others, spoken of as "browns." Under such classification and valuation, the wools, whites and browns, have paid a duty

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of 4 cents per pound. Wools of this class valued at more than 12 cents per pound pay a duty of 7 cents per pound.

This mode of importing and invoicing, classifying and valuing these wools so imported from Bagdad was not questioned or objected to by the United States authorities until about September 29, 1903. Shortly prior to that time, the claimants had purchased a large quantity of wool in the Bagdad market, and with legitimate charges added the cost of same in that market was less than 12 cents per pound. After purchase they caused same to be sorted and separated in the manner above mentioned. The claimants in due course of business had made contracts for the sale and delivery of imported wool in the United States, but these wools, so far as appears, were not purchased for the fulfillment of any particular contract or contracts. The wools so purchased were forwarded to the United States in different consignments. The dates and amounts are immaterial here. On the arrival of the first consignment about November 28 or 29, 1903, at the port of New York, the United States appraiser and those acting under him raised the question that these wools should be invoiced, classified, and valued differently; that is, that, as the whites were worth more at Bagdad after being separated from the commingled mass and would have been worth more in the market if sold separately and were worth more here, the whites should be classified and valued at more than 12 cents per pound as they were worth more than 12 cents per pound, and that the browns, so called, should be classified, etc., at a lower rate, their actual value after separation. These officers thereafter carried out this claim, and altered the mode of invoicing accordingly, so that the white wools paid a duty of seven cents per pound instead of four cents per pound as formerly, while the browns paid the four cents per pound duty as formerly, although the valuation was lowered. In so increasing and decreasing valuations under this new mode of invoicing for importation, the values were so fixed that the total valuation of an invoice was not changed. Against this new mode of invoicing these wools at the port of New York the importers the claimants here protested, and an appeal was taken to the General Appraiser, and from his decision to the Board of General Appraisers, and from the affirmation of the General Appraiser an appeal was taken to the Circuit Court, Southern District of New York. There the decisions of the General Appraiser and of the Board of General Appraisers were approved and affirmed, but, on appeal to the Circuit Court of Appeals, this decision was reversed. The case is reported in 153 Fed. 858, 83 C. C. A. 40. The court said:

"When the merchandise arrived at the port of New York, the duty of the collector was plain. Having ascertained that it was wool imported from Bagdad, he had only to ascertain its market value, not at New York or London or Marseilles, but at Bagdad, add thereto the packing charges and his duty was done. * * * In order that the collector may have an infallible standard by which to measure value Congress enacted section 19 of the customs administrative act (Act June 10, 1890, c. 407, 26 Stat. 139 [U. S. Comp. St. 1901, p. 1924]), that duty shall be assessed upon the actual market value of the merchandise as bought and sold in usual wholesale quantities in the principal markets of the country from whence imported. The rule thus fixed by statute is plain and simple, binding alike on importer and collector. Neither may vary or evade it. Neither may appeal to other criteria of value."

By this decision I am bound. No evidence has been offered that the market value of these white wools, if separated from the others, is greater in Bagdad than the market value of the others. The evidence is that white wools separated from the others have no market value in Bagdad, as they are not bought or sold in the market at Bagdad. The witness states that, if so bought and sold, they would have a greater market value in Bagdad. This must be an opinion based on the fact that the white wools are worth more in the United States and would be worth more in the market at Bagdad if separated and sold in that condition. The statute referred to seems to be plain that the value is fixed by the market value at Bagdad as it exists, and not by a market value that might be established under other conditions which do not obtain there.

Other consignments followed that of September 29th, and these took the same course. The importers protested, and appeals were taken. Certain added duties were collected, but these were all remitted, and the claimants recovered the added duties paid. Pending the litigation referred to over the consignments mentioned, other wools arrived at the port of Boston. The claimants here allowed them to go under general orders and made no attempt to enter them and did not enter them until after the Board of General Appraisers had rendered their decision as to the importations covered thereby. Up to the time that decision was rendered the claimants contended generally that the new mode of invoicing and assessing duties on these wools was illegal and wrong. These contentions in a general way applied, not only to the wools actually entered and then the subject of litigation, but to those under general orders, and in a general way applied to all wools of the same description not yet shipped from Bagdad. After the Board of General Appraisers had rendered its decision, the claimants notified their custom house brokers that, in view of the decision of the General Board, there was only one remedy for them to get possession of the goods, and that was to act upon that decision. In other words, that they must advance their invoices, and Mr. Mauger then raised the values on the invoices of these goods in question here without suggestion or request from the government officials, and told the government officials in charge that they were making their entry according to the decision of the General Board, and that they had to get these wools out of bond now, and that they did not see that they had any advantage now in waiting further since the board had made their final decision based upon the different colors: that they had nothing else to do now but to raise their invoices to conform with the decision. The invoices were raised accordingly by the claimants, and were liquidated, and the claimants paid the duties. No protest was made at this time, and no notice was given that any suit would be brought or claim made for a recovery or repayment of the duties or any part thereof. The witness Mauger stated that they protested to Snelling, the appraiser at Boston, shortly before entering these wools now in question, and, when asked what they said and did in protest, the witness said:

"A. That we had made our fight to get what we believed was a correct interpretation of the law in regard to wools. We lost it by the General Board's decision when they had sustained the appraiser on the appeal, and we had

consequently to face it now after all of our months and years and trial under it, and we were going to conform to that decision. Q. And that is what you mean when you said that you protested on your direct examination. Is that correct? A. Precisely, that is it exactly."

In regard to the appeal to the Circuit Court and Circuit Court of Appeals, the claimants stated, in substance, that they had no confidence in it, but the lawyers told them a wrong had been done, and they believed it could be righted or changed. The claimants desired, of course, to get these wools out of bond, and undoubtedly desired to avoid litigation. It seems plain to me from the evidence that the claimants at the time they took the goods in question from bond and entered them and paid the duties intended to acquiesce in and abide by the decision of the Board of General Appraisers. This was not payment under protest. The United States officials did not raise or change the invoices or direct, or request that it be done. The importers did this themselves following the decision of the General Board of Appraisers. The claimants might have followed the same routine, and might have submitted to the same course of procedure they did as to the consignments involved in the litigation. They might have taken appeals had the decisions been adverse. Had they done so, their remedies would have been the same, and the decision the same in the end. They elected to acquiesce in the decision of the General Board as to the wools in question in this suit. It has been urged that the claimants could not appeal. It is evident that the claimants could not appeal from their own action in changing their own invoices to make market value.

It is evident under the decision of the Circuit Court of Appeals to which attention has been called that the claimants paid more duty than they should have paid. They paid it because of the decision of the General Board in which the claimants acquiesced. That decision was wrong, as subsequent events proved. The question then arises: Was this a payment of excessive or illegal duties under legal duress or compulsion? I am of the opinion that these duties here in question were not paid under any legal duress or compulsion. Chesebrough v. United States, 192 U. S. 253, 259, 260, 24 Sup. Ct. 262, 48 L. Ed. 432; Maxwell v. Griswold, 10 How. 385, 386, 387, 13 L. Ed. 405; Robertson v. Bradbury, 132 U. S. 491, 10 Sup. Ct. 158, 33 L. Ed. 405; Elliott v. Swartwout, 10 Pet. 137, 154, 155, 9 L. Ed. 373; Bend v. Hoyt, 13 Pet. 263, 10 L. Ed. 154; Railroad Co. v. Commissions, 98 U. S. 541, 543, 544, 25 L. Ed. 196; Radich v. Hutchins, 95 U. S. 210, 213, 24 L. Ed. 409; Little v. Bowers, 134 U. S. 547, 554, 10 Sup. Ct. 620, 33 L. Ed. 1016.

In the case at bar there was a mistake of law, not of fact, indulged by both parties, and no recovery can be had based thereon. Elliott v. Swartwout, and Bend v. Hoyt, supra. All the facts were well known to the claimants.

In Maxwell v. Griswold, supra, a case to recover duties, the court said:

"Now, it can hardly be meant in this class of cases that, to make a payment involuntary, it should be by actual violence or any physical duress. It suffices, if the payment is caused on the one part by an illegal demand, and made

on the other part reluctantly and in consequence of that illegality, and without being able to regain possession of his property except by submitting to the payment."

Now, in the case at bar, as to the importations here in question, no demand whatever was made by the United States officials. There was no request by claimants that they be entered on the invoices as they stood when the goods arrived and were allowed to go under general orders. After the decision of the Board of General Appraisers, which, so far as appears, had not then been appealed from, the claimants here voluntarily raised the invoices to make market value and entered the wools on such raised invoices and paid the duties assessed based thereon without objection or protest, except to complain in a general way by stating they must act under that decision in order to get their goods, and were going to conform to the decision of the Board of General Appraisers. Evidently they assumed it to be final. The government officials acquiesced, of course, as was their duty to do. Both parties assumed the law to be as stated by the Board of General Appraisers. If entering goods of a certain kind and paying duties thereon without protest or objection but in accordance with a prior decision of a competent tribunal applicable thereto, except to complain of the decision of such tribunal as to the mode of classification and assessment of duties in regard to prior importation of the same kind or class of goods and which decision on a subsequent or even a pending appeal turns out to be wrong, constitutes an involuntary payment of such duties, then this payment in question was involuntary, otherwise not. I do not think it was an involuntary payment, but a payment voluntarily made under a mistake of law and in the absence of fraud. If this be so, the one-year limitation applies, and this action is barred by lapse of time. Section 21 of the act of June 22, 1874 (chapter 391, 18 Stat. 190 [U. S. Comp. St. 1901, p. 1986]), provides:

"Whenever any goods, wares, and merchandise shall have been entered and passed free of duty, and whenever duties upon any imported goods, wares, and merchandise shall have been liquidated and paid, and such goods, wares, and merchandise shall have been delivered to the owner, importer, agent, or consignee, such entry and passage free of duty and such settlement of duties will, after the expiration of one year from the time of entry, in the absence of fraud and in the absence of protest by the owner, importer, agent, or consignee, be final and conclusive upon all parties."

This applies to importations and actions to recover alleged excessive or illegal duties. This is not questioned by the claimants, but they contend that there was legal protest and a legal or constructive fraud practiced on the importer which takes the case out of this statute. On the question of fraud, the contention is that by years of uniform practice in classifying these wools as stated and assessing duties under that classification the United States had induced the claimants to import these wools, they making contracts for their sale here, on the supposition that they would be classified in the same manner and held to pay duty at the same rate as before; that the subordinate officials had no authority or instructions from their superiors to make the change made, and that it was a constructive fraud on the claimants to suddenly and without notice make the change described. There is no proof that

the change was made for the purpose of injuring or defrauding the claimants in any way. The presumption is that the change was made in the honest belief that the law required it, and that the white wools in question were liable to a higher duty, etc. If so, it was the duty of the officials to make the change and collect the duties. There is no evidence that the claimants would not have purchased these wools at Bagdad or made their contracts to sell here had they known of the changed mode of classification. Remedies are provided for errors in classification, etc. Even if the subordinate officials were negligent, this is no basis for a recovery here. I find no evidence that claimants were defrauded. But, as to the wools in question in this action, I do not see how the officials were in any way or in any degree at fault. They were but following the decision of the Board of General Appraisers, not then, so far as appears, questioned, and the claimants themselves changed or raised the invoices presented without request or any sort of compulsion, unless the decision of that board made in the prior case was duress or compulsion. The claimants declared their purpose to conform to it. I do not think that years of illegal practice in classifying goods and assessing the duties thereon in any way bars the United States from changing to the legal method. If the method is changed, the government is under no obligation to give notice in advance of actual importation. If the importer claims the change to be illegal, due protest should be made, and the remedies pointed out by statute pursued. If a change is made which turns out to be wrong, and, on appeal, a wrong decision is made by one of the appellate tribunals, the remedy is by appeal to the court of last resort. If the decision is reversed, the right of recovery is established as to the goods involved in that litigation. If, however, the importer pending that litigation imports other goods of the same class from the same market and acquiesces in the decision as it stands at that time and in all respects conforms to it without objection or protest, except to complain of the decision in a general way before making such entry, it seems to me that he has accepted it as final so far as that subsequent importation is concerned. In such case I cannot see that there is implied promise to repay the excess duties in case the decision in the former case is reversed on appeal. It would have been easy to say, we must get our goods out of bond, we must enter them, we are compelled to conform to the decision of the Board of General Appraisers, but we deny its correctness, and we comply under protest and because of the necessity we are under in order to get our goods, and we intend to further contest the prior case, or to contest this by bringing suit to recover the excess of duties. Nothing of this kind was done, and as the protest made as to the first importations, made the subject of litigation, did not disclose that it was to apply, or intended to apply to subsequent consignments, or importations of wools (see Schells' Executors v. Fauche, 138 U. S. 562, 570, 571, 11 Sup. Ct. 376, 34 L. Ed. 1040). I am constrained to hold that these duties were voluntarily paid without protest, and in the absence of fraud, and that the petitioners cannot recover.