NEWBURYPORT WATER CO. v. CITY OF NEWBURYPORT.

(Circuit Court, D. Massachusetts. August 8, 1900.)

No. 924.

1. CONSTITUTIONAL LAW—DUE PROCESS OF LAW—FRANCHISE OF CORPORATION —TAKING FOR PUBLIC USE.

The taking by a municipal corporation, for the use of the municipality, of a system of waterworks belonging to a private corporation, under an act of the legislature providing that the valuation to be paid therefor should be the "fair value of said property for the purposes of its use by the city," and that "such value shall be estimated without enhancement on account of future earning capacity, or good will, or on account of the franchise of said company," is a taking without just compensation, and is therefore in conflict with the fourteenth amendment to the constitution of the United States, providing that no person shall be deprived of his property without due process of law.

2. SAME.

Where the franchise granted by the legislature to a private corporation to erect waterworks to supply a city with water is not exclusive, the subsequent grant to the city of the right to build competing waterworks does not constitute a taking of the corporation's property or franchise, within the fourteenth amendment to the constitution of the United States, providing that no person shall be deprived of his property without due process of law.

3. SAME.

By St. Mass. 1893, c. 471, a city was authorized to build its own waterworks, notwithstanding the previous grant of a franchise to plaintiff, but was required to first submit to a vote of its people the questions: First, whether it should purchase the existing works of plaintiff, if the latter desired to sell; and, second, whether it should maintain its own waterworks. The city having voted to supply itself with water, but not to purchase the works of plaintiff, St. Mass. 1894, c. 474, was passed by the legislature, obliging the city to purchase plaintiff's works before proceeding to supply itself with water, if plaintiff within 30 days after the passage of the act notified the mayor of the city of its desire to sell, and provided that, if the parties were unable to agree upon terms of sale, appraisers should be appointed, who should determine the fair value of the property "for the purposes of its use by the city," and "without enhancement on account of future earning capacity or good will, or on account of the franchise of said company." *Held*, that whether the right of the city to build competing waterworks under the act of 1893 existed or not when the act of 1894 was passed, neither the competition authorized under the act of 1893, nor that threatened under the act of 1894, being illegal, the compulsion upon plaintiff to sell its works under the act of 1894 without just compensation, or have the value of same destroyed by the competing works of the city, did not constitute the sale one under duress, which was in effect a taking of plaintiff's property by the city without compensation, within the fourteenth amendment to the constitution of the United States, providing that no person shall be deprived of his property without due process of law.

Lauriston L. Scaife and Robert M. Morse, for complainant.

A. E. Pillsbury and Horace I. Bartlett, for defendant.

Before COLT, Circuit Judge, and BROWN, District Judge.

COLT, Circuit Judge. Under the stipulation of counsel and order of court, the single question now presented is whether the plaintiff has been deprived of its property without due process of law, in viola-

tion of the fourteenth amendment to the constitution of the United States. All other questions as to the plaintiff's relief under its bill, including the question of valuation of the property alleged to have been taken, are to await the determination of the constitutional question.

The plaintiff, the Newburyport Water Company, was chartered by the state of Massachusetts in 1880 to supply the city of Newburyport and its inhabitants with water. St. Mass. 1880, c. 235. The company thereupon constructed a system of waterworks, and proceeded to supply the city and its inhabitants with water. In 1893 the city petitioned the legislature for authority to build its own waterworks. Notwithstanding the opposition of the company, the legislature passed the act of June 10, 1893 (St. Mass. 1893, c. 471), authorizing the city to establish waterworks. After the vote by the city upon the acceptance of the act, the counsel for the city claimed and advised that the city had the right to supply itself and its inhabitants with water. Thereupon the company applied to the legislature to have the city required to purchase its waterworks before it proceeded to supply itself and its inhabitants with water. The application resulted in the passage of the act of June 14, 1894 (St. Mass. 1894, c. 474). This act provided that the city should not proceed to build waterworks under the act of 1893 unless it should first purchase the company's property, which it might do by a majority vote, and that, the city having so voted, the company should within 20 days execute and deliver to the city proper deeds conveying its property; that the property conveyed should thereupon become the property of the city, and that the city should pay to the company the fair value thereof, which, if not agreed upon, should be determined by three commissioners appointed by the supreme judicial court, who should determine the fair value of the property "for the purposes of its use by said city," and "without enhancement on account of future earning capacity or good will, or on account of the franchise of said company." The city voted to purchase, and, on January 29, 1895, the company executed and delivered to the city a duly-authorized deed of all its property and franchise rights. The city took possession of the property, and has ever since managed and operated it. After the conveyance, commissioners were appointed, and on February 3, 1897, they filed in the state court their award. Questions of law arising on the award were reserved by a single justice for the full court, and on June 14, 1897, that court made an order sustaining the action of the commissioners. The commissioners estimated the value of the company's property for the purposes of its use by the city, and excluded from such valuation its future earning capacity, good will, and its right to the use of the streets and to collect water rates.

In order to sustain the contention that the plaintiff has been deprived of its property without due process of law, in violation of the fourteenth amendment to the constitution of the United States, it is necessary to show, as the plaintiff declares in its brief: (1) That the plaintiff's property was taken for public uses; (2) that the property was taken under color of the authority of a state; (3) that the taking was without just compensation. The plaintiff bases the taking of

its property upon the legislative threat to authorize municipal competition, whereby its deed to the city became voluntary only in form, while in fact it was compulsory. This threatened competition, it is claimed, forced the plaintiff, against its will, to convey its property to the city for an insufficient consideration, and made the deed in effect a taking of property without just compensation, under color of legislative authority. The proposition here advanced requires a somewhat extended examination of the acts of 1893 and 1894, and their general bearing upon the single issue before us.

At the outset, it may be observed that, if the plaintiff establish a taking of its property under the acts of 1893 and 1894, it is clearly right in its contention that such taking was without just compensation. The act of 1894 provided that the valuation of the property should be "the fair value of said property for the purposes of its use by said city," and "such value shall be estimated without enhancement on account of future earning capacity or good will, or on account of the franchise of said company." A taking under an act providing such a method of compensation would be unconstitutional, because without just compensation. It would be a taking "without due process of law," in violation of the fourteenth amendment. Where private property is taken for public uses, the legislature cannot fix the compensation, or determine in what it shall consist, or prescribe the rules and principles upon which it shall be computed. Lewis, Em. Dom. § 461. When a taking has been ordered, the question of compensation is judicial, not legislative. The legislature cannot extinguish any part of such compensation, or in any manner "interfere with the just powers and province of courts and juries to administer rights and justice." It is sufficient on this point to cite the language of the supreme court in two cases. In Monongahela Nav. Co. v. U. S., 148 U. S. 312, 327, 13 Sup. Ct. 626, 37 L. Ed. 468, the court said:

"By this legislation congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial and not a legislative question. The legislature may determine what private property is needed for public purposes. That is a question of a political and legislative character. But, when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry. In Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 11 Pet. 420, 571, 9 L. Ed. 773, Mr. Justice McLean, in his opinion, referring to a provision for compensation found in the charter of the Warren Bridge, uses this language: 'They [the legislature] provide that the new company shall pay annually to the college, in behalf of the old one, one hundred pounds. By this provision it appears that the legislature has undertaken to do what a jury of the country only could constitutionally do,—assess the amount of compensation to which the complainants are entitled.' See, also, the following authorities: Com. v. Pittsburgh & C. R. Co., 58 Pa. St. 26, 50; Pennsylvania R. Co. v. Baltimore & O. R. Co., 60 Md. 263; Isom v. Railroad Co., 36 Miss. 300. In the last of these cases, and on page 315, will be found these observations of the court: 'The right of the legislature of the state, by law, to apply the property of the citizen to the public use, and then to constitute itself the judge in its own case, to determine what is the "just compensation" it ought to pay therefor, or how much benefit it has conferred upon the citizen by thus taking his property without

his consent, or to extinguish any part of such "compensation" by prospective conjectural advantage, or in any manner to interfere with the just powers and province of courts and juries in administering right and justice, cannot for a moment be admitted or tolerated under our constitution. If anything can be clear and undeniable, upon principles of natural justice or constitutional law, it seems that this must be so.' We are not,·therefore, concluded by the declaration in the act that the franchise to collect tolls is not to be considered in estimating the sum to be paid for the property."

In Reagan v. Trust Co., 154 U. S. 409, 410, 14 Sup. Ct. 1059, 38 L. Ed. 1027, the court observed:

"If the state were to seek to acquire the title to these roads under its power of eminent domain, is there any doubt that constitutional provisions would require the payment to the corporation of just compensation; that compensation being the value of the property as it stood in the markets of the world, and not as prescribed by an act of the legislature?"

We have to ascertain, then, in order to dispose of the question before us, whether there was a taking of the plaintiff's property (the term "property" including franchise rights) by or under the acts of 1893 and 1894. The taking complained of in this case was by right of eminent domain and not under the guise of taxation or police regulation. Eminent domain "embraces all cases where, by authority of the state and for the public good, the property of the individual is taken, without his consent, for the purpose of being devoted to some particular use." Lewis, Em. Dom. § 1. Where the state grants a franchise to a corporation, and subsequently grants a similar franchise to another corporation, the question of a taking may be considered from three points of view: Where the first grant is not exclusive, the subsequent grant is not a taking which entitles the owner of the first franchise to compensation. Where the first grant is exclusive, the grant of a rival franchise is a taking, and just compensation must be made. Where the first grant is exclusive, the grant of a similar franchise does not constitute a taking requiring compensation, when the state, by. its constitution or statute law, has reserved to itself the power to repeal, alter, or amend charters granted by the legislature. Such reservation becomes a part of the charter of every corporation. Shortly stated, the grant by the state of a competing franchise does not constitute a taking of a former nonexclusive franchise, while in the case of an exclusive franchise it does constitute a taking, in the absence of a reserve power in the state. Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 7 Pick. 344, affirmed in 11 Pet. 420, 9 L. Ed. 773; Hamilton Gaslight & Coke Co. v. City of Hamilton (C. C.) 37 Fed. 832, affirmed in 146 U. S. 258, 13 Sup. Ct. 90, 36 L. Ed. 963; Greenwood v. Freight Co., 105 U. S. 13, 26 L. Ed. 961; In re Binghampton Bridge, 3 Wall. 51, 18 L. Ed. 137; Tomlinson v. Jessup, 15 Wall. 454, 21 L. Ed. 204; Waterworks v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48, 28 L. Ed. 173; Sioux City St. Ry. Co. v. Sioux City, 138 U. S. 98, 11 Sup. Ct. 226, 34 L. Ed. 898; Water Co. v. Clark, 143 U. S. 1, 12 Sup. Ct. 346, 36 L. Ed. 55; People v. Cook, 148 U. S. 397, 410, 13 Sup. Ct. 645, 37 L. Ed. 498; New York & N. E. R. Co. v. Town of Bristol, 151 U. S. 556, 567, 14 Sup. Ct. 437, 38 L. Ed. 269; City of Covington v. Kentucky, 173 U. S. 231, 19 Sup. Ct. 383, 43 L. Ed. 679; Metropolitan R. Co. v. Highland St. Ry. Co., 118 Mass. 290, 293;

Thornton v. Railway Co., 123 Mass. 32; Proprietors of Piscataqua Bridge v. New Hampshire Bridge, 7 N. H. 35; Boston & L. R. Corp. v. Salem & L. R. Co., 2 Gray, 1; Power v. Village of Athens, 99 N. Y. 592, 2 N. E. 609.

The act of 1893 authorized the city to supply itself and its inhabitants with water, provided, if the company so desired, the city should first vote upon the proposition to purchase the company's works. The city voted not to purchase, and did vote to accept the provisions of the act. The franchise rights granted to the company by its charter were not exclusive. This is not disputed. We have then presented the question whether the subsequent grant to the city of the right to build competing waterworks constituted a taking of the plaintiff's property or franchise. It is the settled law of this country, established by the decisions of the federal and state courts, that such a grant is not a taking of a former franchise, giving any right to compensation. "Where the grant is not by its terms exclusive, the legislature is not precluded from granting a similar franchise or erecting a rival way or structure, the result of which may be to greatly impair or even totally destroy the value of the former grant, and such damage is not a taking of the former franchise which entitles its owner to compensation. This principle was settled in the leading case of Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, and has been confirmed by numerous decisions." Lewis, Em. Dom. § 136. In the case of Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 7 Pick. 344, the supreme court of Massachusetts held that the grant by the legislature of a competing franchise did not devest vested rights or impair the obligation of a contract. On appeal (11 Pet. 420, 9 L. Ed. 773), the supreme court of the United States placed its decision on the latter ground. This was before the passage of the fourteenth amendment, so that the only federal constitutional right involved related to contract. In Hamilton Gaslight & Coke Co. v. City of Hamilton (C. C.) 37 Fed. 832, 836, where a municipality was proceeding to construct competing gas works under a state statute, the point was taken that the statute interfered with vested rights, and impaired, if it did not destroy, the property of the company, and was in effect an appropriation of private property to public use without making compensation, in violation of the fourteenth amendment to the constitution of the United States. The court decided against this contention. In the supreme court, on appeal (146 U. S. 258, 13 Sup. Ct. 90, 36 L. Ed. 963), as appears from the statement of the case by the court on page 259, 146 U. S., page 90, 13 Sup. Ct., and page 965, 36 L. Ed., the plaintiff invoked the protection of the contract clause of the constitution, as well as the clause that no state shall deprive any person of property without due process of law. The court, in its opinion, affirming the judgment below, only discusses the question whether there was any impairment of the obligation of a contract, and by implication, at least (for the point was necessarily involved in the decision), held that the claim that the plaintiff was deprived of its property without due process of law was so untenable as a legal proposition as not to require discussion. It may be said that, since the decision in Proprietors of Charles River Bridge v. Proprietors of

Warren Bridge, the supreme court and other courts in this country have recognized the law as settled that, where the state grants a franchise which is not by express terms made exclusive, the subsequent grant of a similar and competing franchise impairs no constitutional right; that it is neither a violation of the obligation of a contract, nor an impairment of vested rights, nor a taking of property without just compensation. In Bridge Co. v. Smith, 30 N. Y. 44, 61, the court observed:

"Since the case of Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 11 Pet. 420, 9 L. Ed. 773, it has been understood to be the law that it is competent for the legislature, after granting a franchise to one person or corporation which affects the rights of the public, to grant a similar franchise to another person or corporation, the use of which shall impair or even destroy the value of the first franchise, although the right so to do may not be reserved in the first grant, unless the right so to do is expressly prohibited by the first grant."

In Salem & H. Turnpike Co. v. Town of Lyme, 18 Conn. 451, 457, the court said:

"Since the decision of this court in the case of Enfield Toll-Bridge Co. v. Hartford & N. H. R. Co., 17 Conn. 454, and of the supreme court of the United States in the case of Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 11 Pet. 420, 9 L. Ed. 773, and the numerous decisions to the same effect cited in those cases, we do not think it an open question whether a new road, canal, or bridge, materially diverting travel or business from an old one under a prior charter, is therefore unconstitutional, or to be suppressed."

In Lafayette Plank-Road Co. v. New Albany & S. R. Co., 13 Ind. 90, 92, the court declared:

"The grant of a charter for a road, a bridge, or a ferry does not estop the legislature from granting a subsequent charter for a road, bridge, or ferry which may compete with the former in the transportation of freight and passengers between given points; and the simple fact that the two run parallel, and mutually diminish the business of each other, is no ground for a claim by either for damages."

Although the supreme court, in those cases where the exercise of this power by or under the state has been disputed, has usually confined the discussion of the alleged violation of constitutional rights to the contract clause, the language of the court in those cases is instructive, and has an important bearing on the specific question under consideration. In Water Co. v. Easton, 121 U. S. 388, 390, 7 Sup. Ct. 918, 30 L. Ed. 1059, the court said:

"By constructing waterworks of its own, the borough will not destroy the franchises of the plaintiff company. It may impair their value, and probably will do so, but of this the company have no legal cause of complaint. The granting of a new charter to a new corporation may sometimes render valueless the franchises of an existing corporation, but, unless the state by contract has precluded itself from such new grant, the incidental injury can constitute no obstacle."

In Stein v. Water-Supply Co., 141 U. S. 67, 81, 11 Sup. Ct. 896, 35 L. Ed. 628, the court said:

"Guided by this rule, in respect to which there is no difference of opinion in the courts of this country, we are forbidden to hold that a grant under legislative authority of an exclusive privilege, for a term of years, of supplying a municipal corporation and its people with water drawn by means of a system of waterworks from a particular stream or river, prevents the state from granting to other persons the privilege of supplying during the same period the"

same corporation and people with water drawn in like manner from a different stream or river."

In Hamilton Gaslight Co. v. City of Hamilton, 146 U. S. 258, 13 Sup. Ct. 90, 36 L. Ed. 963, the company maintained that its charter was exclusive. The city was proceeding to build works of its own, claiming statutory authority therefor. As we have already observed, the company in that case contended that this was an impairment of its charter, and a taking of its property without due process of law. The court observed at page 268, 146 U. S., page 93, 13 Sup. Ct., and page 968, 30 L. Ed.:

"It may be that the erection and maintenance of gas works by the city at the public expense, and in competition with the plaintiff, will ultimately impair, if not destroy, the value of the plaintiff's works for the purposes for which they were established. But such considerations cannot control the determination of the legal rights of the parties."

In Pearsall v. Railroad Co., 161 U. S. 646, 664, 16 Sup. Ct. 709, 40 L. Ed. 844, the court said:

"An exclusive right to enjoy a certain franchise is never presumed, and, unless the charter contain words of exclusion, it is no impairment of the grant to permit another to do the same thing, although the value of the franchise to the first grantee may be wholly destroyed. This principle was laid down at an early day in the case of Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 11 Pet. 420, 9 L. Ed. 773, and has been steadily adhered to ever since."

Long Island Water-Supply Co. v. City of Brooklyn, 166 U. S. 685, 17 Sup. Ct. 718, 41 L. Ed. 1165, was an appeal from the New York court of appeals. The court (page 696, 166 U. S., page 722, 17 Sup. Ct., and page 1169, 41 L. Ed.) said:

"The court of appeals held that neither the statute under which the company was organized, nor the contract, nor the act of annexation, gave to the company rights exclusive and beyond the reach of legislative action. These conclusions of the court of appeals are vigorously challenged in the argument, but we are of opinion that they are correct. The statute simply provided for the organization of water companies. The contract in terms contained no words of exclusion. It gave to the company the privilege of laying its mains in the streets of the town, and contained a covenant on the part of the town to pay certain hydrant rentals. But grants from the public are strictly construed in favor of the public, and grants of a privilege are not ordinarily to be taken as grants of an exclusive privilege."

As the franchise granted to the plaintiff by its charter was not exclusive, the subsequent grant by the act of 1893, giving the city authority to construct independent and competing waterworks, was not a violation of the plaintiff's charter or of any constitutional right.

In establishing the power of the legislature to grant a competing franchise, the conflict has been between the rightful claims of the public and the protection secured to private property by constitutional provisions. Before the case of Proprietors of Charles River Bridge v. Proprietors of Warren Bridge (1837), many eminent judges and lawyers were of the opinion that such legislation impaired vested rights of property, and violated the contract between the state and the corporation secured by charter. In that case, however, it was successfully urged, though the court were divided in opinion, that the grant by the sovereign authority of a franchise to build a

bridge over a public waterway and to collect tolls did not prohibit the grant of another franchise to construct a bridge over the same waterway, which was free to the public, though the effect was to impair or even destroy the value of the first grant. Whatever doubt may have formerly existed as to this power of the legislature, and however cogent and just the argument may be against its exercise in a particular case, the right of the legislature to exercise it in any case cannot now be questioned; and when a franchise is now obtained for the purpose of establishing waterworks, or to promote like enterprises in which the public are interested and capital is invested, it should not be upon the assumption or belief that the town or city will refrain from competition and the legislature will refuse to authorize it. On the contrary, this legislative power having been upheld and enforced for so many years, it may well be presumed that, when a franchise is obtained which is not exclusive, it is taken with the knowledge and risk that the legislature is not precluded from granting at any moment a similar and competing franchise.

Before examining the act of 1894, it may be well to call attention to some preliminary considerations. The plaintiff contends that the taking in this case was wholly under the act of 1894, and that the act of 1893 never took effect, because the "vote to purchase" the company's works, under section 12 of the act, was a condition precedent to the city's right to vote to supply itself and its inhabitants with water, under section 13; and, the city having voted not to purchase, the act failed, and consequently the subsequent vote by the city to accept the provisions of the act was nugatory. This construction seems contrary to the intent and purpose of the act. The natural and reasonable construction of sections 12 and 13, looking at the whole act, is that the city should first decide whether it would purchase the plaintiff's works, before determining whether it would build works of its own. For the purpose of our present inquiry, however, it is unnecessary to pass upon this question. If the act of 1893 were in force, as contended by the defendant, there was, as we have seen, no taking of the plaintiff's property under it. If it were not in force, there surely was no such taking. But, whether legally in force or not, it clearly appears that it was the fear or belief of the company, the city, and the legislature that the act of 1893 was operative, which led to the passage of the act of 1894. After the vote by the city accepting the act of 1893, the company petitioned the legislature that the city should buy its property and franchise before proceeding to build waterworks under the act. Accompanying this petition was a proposed bill which provided that the city should, "before proceeding to supply itself and its inhabitants with water under the authority of chapter four hundred and seventy-one of the Acts of the Year One Thousand Eight Hundred and Ninety-Three, purchase from the Newburyport Water Company the franchise, corporate property, and all the rights and privileges of said Newburyport Water Company." It further provided that the compensation to be paid by the city should be determined by three commissioners appointed by the supreme judicial court. Thereupon the legislature passed the act of

1894, obliging the city to purchase the plaintiff's works before proceeding to supply itself and its inhabitants with water under the act of 1893, and at the same time fixing the measure of compensation to be paid by the city. Section 1 declares:

"If, within thirty days after the passage of this act, the Newburyport Water Company shall notify the mayor of the city of Newburyport in writing that it desires to sell to said city all the rights, privileges, easements, lands, waters, water rights, dams, reservoirs, pipes, engines, boilers, machinery, fixtures, hydrants, tools and all apparatus and appliances owned by said company and used in supplying said city and the inhabitants thereof with water, said city shall not proceed to supply water to itself or its inhabitants, under the authority of chapter four hundred and seventy-one of the Acts of the Year Eighteen Hundred and Ninety-Three, unless it shall have first purchased of said company the property aforesaid; and said company is authorized to make sale of said property to said city, and said city is authorized to purchase the same."

The act then provides that, whenever the city shall vote to purchase said property, "notice of the desire of said company to sell the same having been given as hereinbefore provided," the company shall within twenty days convey by deed its property to the city, and the city shall pay "the fair value thereof to be ascertained as hereinafter provided." If the parties are unable to agree upon the value of the property, commissioners are to be appointed, "who shall determine the fair value of said property for the purposes of its use by said city, and whose award, when accepted by the court, shall be final. Such value shall be estimated without enhancement on account of future earning capacity or good will, or on account of the franchise of said company." Section 4 of the act declares:

"In case said city shall, in violation of section one of this act, proceed to supply itself or its inhabitants with water before making the purchase aforesaid. the supreme judicial court shall, upon petition of said company, have jurisdiction in equity to enjoin said city from so doing until it shall have made such purchase."

Before the consideration of what the plaintiff claims was the legal effect of this act, let us refer for a moment to its manifest purpose. Recognizing the act of 1893 as in force, it simply prohibits the city from exercising the right to build waterworks under that act if the plaintiff desires to sell its works to the city upon the terms provided. There is certainly nothing on the face of the act which authorizes the taking of the plaintiff's property without its consent. It does not in terms compel the company to sell its property to the city. On the contrary, it expressly declares that the company may do so if it "desires." If the act provide for a voluntary conveyance, the insufficiency of the consideration prescribed has no bearing on the issue before us. The question of compensation becomes material only in the event that the sale under the act was made without the plaintiff's consent. If this does not appear, there is no violation of the constitutional right now invoked, whatever other relief the plaintiff may be entitled to. The great injury which at this time threatened the company's property was municipal competition under the act of 1893, and the act of 1894 was passed as a protection against such impending disaster. The legislature might have provided in that act, and there is much force in the contention that

in justice and equity it ought to have provided, that the plaintiff should receive full compensation for its property purchased by the city, but the failure of the legislature to make such provision cannot change the nature and scope of a statute which authorized a voluntary sale into a statute which authorized the taking of the plaintiff's property without its consent by right of eminent domain.

We will now consider more directly and specifically the general argument advanced by the plaintiff to establish a taking of its property without just compensation. This argument may be summarized as follows: The act of 1893 never took effect, and was void, except so far as it was re-enacted in the act of 1894. The act of 1894 was in effect a threat by the state that it would authorize the city to build competing waterworks, and so ruin the company, unless it consented to convey its property to the city without just compensation; that in consequence of such threat the company conveyed its property to the city; that by reason of such threat the deed of conveyance, though voluntary in form, was in fact compulsory; that such compulsion constituted duress, and made the conveyance a taking; that such taking was plainly without just compensation, by the terms of the act. Stated in another form, the proposition is that a threatened lawful grant by the state to B. of a franchise similar to one already granted to A. is an exercise of unlawful compulsion on the part of the sovereign authority, and that a voluntary conveyance of property under a statute containing such a threat, and not providing for full compensation, is voluntary only in form, while in fact it is made under duress; that consequently such a statute in effect authorized a taking of property without just compensation, in violation of a constitutional right. The plaintiff's contention is founded upon the hypothesis that the right of the city to build competing waterworks under the act of 1893 did not exist when the act of 1894 was passed. If, however, the act of 1893 was in force at that time, as we are inclined to hold, then the state threatened nothing by the act of 1894, because it had already authorized municipal competition. In that case we are confronted with this question: Whether, the city having the right to compete, it was lawful for the legislature to pass the act of 1894 forbidding the city so to do, providing the company chose to sell on terms which did not award full compensation for its property. But it can hardly be seriously urged that when the company was met by legal competition, which meant ruin, it was unlawful for the legislature to pass an act which at least made the situation less disastrous, and providing at the same time that the company need not avail itself of the act unless it saw fit. Nor is the situation any different in principle if we assume that the act of 1893 was void, and that we have only to consider the act of 1894. The only difference is that in one case the legislature had authorized legal competition, and in the other, as it is claimed, it threatened to authorize legal competition. But, if competition be lawful, threatened competition is lawful. And, if it were lawful for the state to authorize municipal competition, it was not unlawful for it to threaten to authorize municipal competition. But it is urged (and this is the

crucial point in the plaintiff's argument) that the threat of. competition produced compulsion which amounted to duress, and consequently made the sale by the company to the city not a voluntary, but a compulsory, act, and, being compulsory, its effect was a taking of the plaintiff's property without just compensation. The plaintiff's whole position hinges on the question of compulsion. In approaching this question it may be observed that there was a greater degree of compulsion on the part of the state if we assume the act of 1893 was operative than if we assume it was void. In the former case municipal competition had actually been authorized, while in the latter case it was only threatened. But what was the compulsion in this case? It was the compulsion arising from the fear of competition produced by what is termed the threat of the state to authorize municipal competition. If a person apprehensive of competition sells his property for less than its fair value, it cannot be said that in law the sale was voluntary in form only, and in fact compulsory. In a certain sense, such a sale is compulsory. It is, however, a kind of compulsion which will always exist so long as competition exists. But this is not the kind of compulsion that amounts in law to duress, because it lacks the essential ingredient of duress, namely, illegality. It is unlawful compulsion which constitutes duress. "Duress exists," says Judge Cooley, "when one, by the unlawful act of another, is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will." Hackley v. Headley, 45 Mich. 569, 574, 8 N. W. 511. Duress by the government or its officers, in this class of cases, is defined by the supreme court as "moral duress not justified by law." Maxwell v. Griswold, 10 How. 242, 256, 13 L. Ed. 405. It must be the pressure arising from unlawful acts or demands on the part of the government or its officers to produce that constraint of will or action, or state of necessity or compulsion, which render acts voluntary in form involuntary and void. In this class of cases the test is, was the cause of the compulsion lawful or unlawful? If the compulsion be founded on lawful competition, or the threat of lawful competition, there is no element of illegality about it. Such compulsion is justified by law. The whole question of compulsion or duress in this case turns upon whether municipal competition, actual or threatened, under the authority of the state, was justified by law. · If it were, as we have shown, then the deed to the city was not given under unlawful compulsion or duress, but was voluntary in fact and in law. On the other hand, it may be said that, if it had been unlawful for the state to authorize municipal competition, then the threat so to do might have been held to have amounted to duress not justified by law, and consequently the deed of the plaintiff's property to have been in effect a taking without just compensation under the authority of the state. In the supreme court cases relied on by the plaintiff, it will be found that the compulsion or duress was based upon an illegal act or exaction, or threatened illegal act or exaction, by the government or its officers. U. S. v. Tingey, 5 Pet. 115, 129, 8 L. Ed. 71, was a suit brought by the government upon a bond, variant from that prescribed by law,

demanded of a public officer upon the peril of losing his office. Mr. Justice Story, delivering the opinion of the court, said:

"The substance of this plea is that the bond, with the above condition, variant from that prescribed by law, was, under color of office, extorted from Deblois and his sureties, contrary to the statute, by the then secretary of the navy, as the condition of his remaining in the office of purser and receiving its emoluments. There is no pretense, then, to say that it was a bond voluntarily given, or that, though different from the form prescribed by the statute, it was received and executed without objection. It was demanded of the party upon the peril of losing his office. It was extorted under color of office, against the requisitions of the statute. It was plainly, then, an illegal bond; for no officer of the government has a right, by color of his office, to require from any subordinate officer, as a condition of holding office, that he should execute a bond with a condition different from that prescribed by law. That would be, not to execute, but to supersede, the requisitions of law. It would be very different where such a bond was, by mistake or otherwise, voluntarily substituted by the parties for the statute bond, without any coercion or extortion by color of office."

Maxwell v. Griswold, 10 How. 242, 13 L. Ed. 405, was a case where an appraisement of imported goods was erroneously made as to the point of time of the valuation, and the importer paid the consequent excess of duties. The government contended that this was voluntary. The court (page 256, 10 How., and page 411, 13 L. Ed.) said:

"But this addition and consequent payment of the higher duties were so far from voluntary in him that he accompanied them with remonstrances against being thus coerced to do the act in order to escape a greater evil, and accompanied the payment with a protest against the legality of the course pursued towards him. Now, it can hardly be meant, in this class of cases, that, to make a payment involuntary, it should be by actual violence or any physical duress. It suffices if the payment is caused on the one part by an illegal demand, and made on the other part reluctantly and in consequence of that illegality, and without being able to regain possession of his property except by submitting to the payment. All these requisites existed here. We have already decided that the demand for such an increased appraisal was illegal. The appraisal itself, as made, was illegal. The raising of the invoice was thus caused by these illegalities in order to escape a greater burden in the penalty. The payment of the increased duties thus caused was wrongfully imposed on the importer, and was submitted to merely as a choice of evils. He was unwilling to pay either the excess of duties or the penalty, and must be considered, therefore, as forced into one or the other by the collector, colore officii, through the invalid and illegal course pursued in having the appraisal made of the value at the wrong period, however well meant may have been the views of the collector. The money was thus obtained by a moral duress, not justified by law, and which was not submitted to by the importer, except to regain possession of his property withheld from him on grounds manifestly wrong."

In Swift Co. v. U. S., 111 U. S. 22, 28, 4 Sup. Ct. 247, 28 L. Ed. 343, the plaintiffs, who were manufacturers of matches, and furnished their own dies for the stamps used by them, and were thereby entitled to a commission of 10 per cent. in money on the price of the stamps, accepted for a long period their commissions in stamps because the treasury department would pay in no other manner. The court held that the apprehension of being stopped in their business by this illegal exaction was a sufficient moral duress to make their payments involuntary. Mr. Justice Matthews, delivering the opinion of the court, said:

"The question is whether the receipts, agreements, accounts, and settlements made in pursuance of that demand and necessity were voluntary in such sense as to preclude the appellant from subsequently insisting on its statutory right. We cannot hesitate to answer that question in the negative. The parties were not on equal terms. The appellant had no choice. The only alternative was to submit to an illegal exaction or discontinue its business. It was in the power of the officers of the law, and could only do as they required. Money paid or other value parted with under such pressure has never been regarded as a voluntary act, within the meaning of the maxim, 'Volenti non fit injuria.'"

In support of the position taken, the court (page 29, 111 U. S., page 247, 4 Sup. Ct., and page 343, 28 L. Ed.) referred to numerous cases:

"In Close v. Phipps, 7 Man. & G. 586, which was a case of money paid in excess of what was due in order to prevent a threatened sale of mortgaged property, Tindal, C. J., said: 'The interest of the plaintiff to prevent the sale by submitting to the demand was so great that it may well be said the payment was made under what the law calls a species of duress.' And in Parker v. Railway Co., 7 Man. & G. 253, the wholesome principle was recognized that payments made to a common carrier to induce it to do what by law, without them, it was bound to do, were not voluntary, and might be recovered back. Illegal interest paid as a condition to redeem a pawn was held in Astley v. Reynolds, 2 Strange, 915, to be a payment by compulsion. This case was followed, after a satisfactory review of the authorities, in Tutt v. Ide, 3 Blatchf. 249, Fed. Cas. No. 14,275b; and in Ogden v. Maxwell, 3 Blatchf. 319, Fed. Cas. No. 10,458, it was held that illegal fees exacted by a collector, though sanctioned by a long-continued usage and practice in the office, under a mistaken construction of the statute, even when paid without protest, might be recovered back, on the ground that the payment was compulsory and not voluntary."

The court then cites Maxwell v. Griswold, 10 How. 242, 13 L. Ed. 405, and other cases.

In Robertson v. Frank Bros. Co., 132 U. S. 17, 10 Sup. Ct. 5, 33 L. Ed. 236, a customs official proceeded in his appraisement upon a wrong principle, contrary to law; and it was held that the compulsory insertion, under threat of an onerous penalty, by the importer, of such additional charges upon the entry and invoice, which necessity involved the payment of increased duties, makes the payment of those duties involuntary. In delivering the opinion of the court, Mr. Justice Bradley (page 24, 132 U. S., page 7, 6 Sup. Ct., and page 239, 33 L. Ed.) said:

"In our judgment, the payment of money to an official, as in the present case, to avoid an onerous penalty, though the imposition of that penalty might have been illegal, was sufficient to make the payment an involuntary one. It is true that the thing done under compulsion in this case was the insertion of the additional charges upon the entries and invoices, but that necessarily involved the payment of the increased duties caused thereby, and in effect amounts to the same thing as an involuntary payment."

Mr. Justice Bradley in that opinion refers to the language of the decisions in Maxwell v. Griswold and Swift Co. v. U. S., which we have cited, and in speaking of the former case he declares that "the ultimate fact was the moral duress not justified by law."

In the above cases, which are cited by the plaintiff, it is seen that it is the element of illegality which lies at the foundation of this species of duress. In those cases the moral duress was caused by the illegal acts or demands of the government or its officers. In the case at bar there was no moral duress not justified by law, be-

cause it was lawful for the state to authorize, or threaten to authorize, municipal competition. There would have been a close analogy between those cases and the present if the plaintiff had possessed an exclusive franchise, and the legislature had, contrary to law, authorized, or threatened to authorize, municipal competition. In that event it might have been claimed that the company was compelled to convey its property to the city under an unlawful exercise of legislative power, and therefore under moral duress not justified by law.

The plaintiff argues that the measure of compensation provided by the act of 1894 was not justified by law, and that consequently the principle recognized in the above cases is applicable to the present case. But this is an attempt to connect things that are entirely distinct. The compensation to be paid for the plaintiff's property has nothing to do with the subject of duress. It was not the want of just compensation, but the threat of municipal competition, which was the cause of the alleged duress. To connect the alleged duress with the lack of compensation involves the proposition that the compulsion which forced the plaintiff to deed its property to the city was owing to the unlawful compensation provided by the act of 1894, and not to the threatened competition by the city. The want of just compensation has no bearing on the question before us, unless the plaintiff first establishes a duress not justified by law. And this brings us to the decisive point on the issue under consideration, and the conclusion we have reached. We hold, for the reasons already given, that the grant of a competing franchise to the city in this case was a lawful exercise of legislative power, and that the threatened grant of such a franchise under the act of 1894 (admitting this to be the effect of the act) was a lawful exercise of legislative power, and that, being lawful, it could not in either case have the legal effect of making a voluntary conveyance of the plaintiff's property compulsory and void, and that consequently the plaintiff has failed to establish a taking of its property without just compensation under the authority of the state. Upon the single question submitted for our determination, and without passing on any other question concerning the plaintiff's relief under the bill, we are of opinion, after careful consideration, that the plaintiff has not been deprived of its property without due process of law, in violation of the fourteenth amendment to the constitution of the United States, and a decree may be drawn accordingly.