Van Voorhis, J.
(dissenting). The dissenting Justices concur with the majority, nor is there disagreement in the court, in condemning the attitude and conduct of the government of the Soviet Union toward religion. The difference in opinion relates entirely to whether, in view of the canons, ecclesiastical practices and history of the Russian Orthodox Church, the law of New York State requires that the material possessions of its American branch must continue to be administered from Moscow while the Patriarch and Holy Synod there are, as plaintiff contends, dominated and controlled by the Soviet atheistic regime. Our dissent is based upon the view that the law does not require this result.
The immediate subject of this action is the right to occupancy and control of St. Nicholas Cathedral on East 97th Street in New York City. In order to decide that question, it is necessary to determine who at this time is deemed to be in administrative control of the Russian Orthodox Church in America, since that official is entitled to occupy and control the cathedral. The outcome of this suit, therefore, depends upon who is to have charge of the temporalities of the entire Russian Orthodox Church on this continent, including churches, parish houses, rectories and revenue-producing properties. Plaintiff represents a large group of Russian Orthodox Churches which have proclaimed the independence of the American branch from administrative control by the central church authorities in Moscow while dominated by the Soviet state. Defendant Benjamin Fedchenkoff has been designated by the Patriarch while under such domination as archbishop and metropolitan to rule over the Russian Orthodox Church in the United States and elsewhere in North America. The autonomous group has created no doctrinal schism, and its members desire to worship in their ancestral churches according to their ancient forms, but without being subject to administrative control by a central organization which has become subservient to the Soviet state. The judgment appealed from, in denying to plaintiff the occupation and control of St. Nicholas Cathedral, necessarily determines that plaintiff and its affiliated churches to which belong most of the communicants of the Russian Orthodox Church in the United States, have lost the right to the enjoyment of their properties while they continue to refuse to recognize the administrative acts of the Russian central church authorities.
*322 It seems to us that, instead of being schismatics, the group in America to which plaintiff belongs is adhering, insofar as possible, to the orthodox tradition, from which the Russian high church authorities departed when, yielding to force, they accepted what might he termed the Russian Orthodox Church of the communist obedience. These ecclesiastical officials in Moscow, having become in fact an instrumentality of the Soviet Government, have ceased to function as the church tribunal to which the civil courts must look in ordering disposition of temporalities in this country, and the conventions (sobers) of the Russian Orthodox Church in America have, for a period of indefinite duration, taken their place as the authority to be followed by us respecting property of the Russian Orthodox Church within this jurisdiction. The New York State Legislature has recently so declared in clear and, as it seems to us, unmistakable terms (L. 1945, ch. 817; L. 1948, ch. 711).
Although the church in Russia was aided financially and subjected to political influence of the czars, one is not justified in assuming, nor does the majority opinion go so far as to state, that the orthodox church in Russia was ever before sought to be reduced by government to a condition approximating that of being a mere communist front. The majority opinion admits that religion was proscribed and the orthodox church in Russia persecuted by the Soviet Government.
This record and facts to which we may not blind ourselves show that religious liberty in Soviet Russia is nonexistent; that the church has lost its independence and freedom of action under superimposed political pressures; that the government in Russia does not permit freedom of activity to the church itself or its judicatories; that the political creed of the controlling power in Russia is essentially atheistic; that the Soviet regime is anti-religious; that the supreme church authority in Russia has pledged itself to the government of the communistic atheistic state, and the church in Russia is under involuntary restraint of the civil authorities. In such state of facts, how can it reasonably be said that the central organization of the orthodox church in Russia is able to function as the governing entity of a Christian religious society? If neither the church nor its head are free, their administrative acts are not their own but those of the Soviet state.
It is fundamentally erroneous to treat St. Nicholas Cathedral and the parishes comprising at least four fifths of the Russian Orthodox Churches in the United States as schismatics, for the *323 reason that they desire to retain their ancient faith and order, unmolested by the group which has seized power in Russia, and has seized the church for its own uses. The repeated efforts of these American communicants to achieve some tangible expression of their spiritual unity with believers in Russia, but without being subject to the formal functioning of the central church organization as a department of the Russian state, should count in their favor in this action. Their adherence to tradition is one of the indications that they are not the chief divisive element, but rather that, in truth and in fact, it is the church in Russia that has been constrained. The distinction between spiritual communion in faith and administrative control must be kept in mind. Christianity cannot permanently be suppressed in Russia. That is something which principalities and powers have been unable to accomplish from the beginning. But it is hardly facing the facts if one fails to realize that the present Russian government has done and is doing all that is politically possible to extirpate it, except as a mere form for purposes of Soviet aggrandizement, and that such persistence as the religion has manifested there since the revolution has come from the bottom up rather than from the top down. The problem sub judice, as both the trial court has held and as this court is holding, concerns the identification of the beneficiaries for whose use and enjoyment St. Nicholas Cathedral and the other temporalities in this country were dedicated. Instead of disputing the trust principle, the plaintiff stands upon it. The difference in point of view is that plaintiff maintains that these temporalities are torn away from their intended use, if they are held to be subject to the jurisdiction of officials who could not function in Moscow, whatever pious names they bear, except on the dictates of a government whose every action indicates that its political philosophy is based upon the destruction of what Christians of all denominations hold to be dear.
Recognition of these facts does not place the courts or the Legislature in the fields of theology or of ecclesiastical jurisdiction; it is necessary for the civil authorities to act upon them in ascertaining and identifying the “ church judicatories ” mentioned in Watson v. Jones (13 Wall. [U. S.] 679), whose word in those fields is to be accepted" as final in ordering the temporal concerns of religious corporations.
The statement in the majority opinion that the central church organization in Russia was sufficiently real for the Russian church in America to deal with it and seek reunion, is answered *324 by the utter frustration of those efforts. The 1945 sobor in Russia was ££ universal ” in character only if we ignore the subterfuge whereby the American delegates were detained in Siberia until the sessions of the sobor had been completed. This maneuver is not to be brushed aside as something done by the Russian £ £ civil ’ ’ as distinct from ecclesiastical authority. The Patriarch did not deplore but availed himself of it, refused to give a hearing to the American delegates, and handed them an uncompromising ultimatum upon arrival based upon action that had been taken in their absence. This incident illustrates the closeness of the connection between the civil and high ecclesiastical authorities.
That was the sobor at which the present ruling Patriarch Alexi was chosen, who is to have rule over St. Nicholas Cathedral and the rest of the Russian orthodox churches in the United States if the judgment below is affirmed.
Always the American delegates safeguarded their declaration of administrative independence, by expressly adhering to their refusal to acknowledge any connection with the church in Russia as a formal functioning organization while under Soviet dominance. Reunion upon the terms of the American delegates would have required a fundamental change in the present relation in Russia between church and state. No such reform was forthcoming, and the situation remained as before. This willingness to be in spiritual communion amounted to no waiver of rights by the autonomous body in America. Neither did the 1946 sobor in Cleveland, Ohio, sacrifice administrative independence. Its effect was to re-emphasize that no doctrinal schism separated the mass of believers in Russia aud in the United States, but that there must be administrative independence while the identity of the church organization in Russia remains merged in the Soviet state. American members of the Russian church are not responsible for what has happened in the Kremlin.
When the proposition is thus stated, it is beside the point that Soviet citizens are permitted to own property in the United States. That has no relation to whether St. Nicholas Cathedral and the other Russian church temporalities in America have been dedicated to the use of those who have been, or who desire to be, identified with the traditions of this religious society as they existed before its central organs were subverted by Soviet power.
*325 In order to approach more closely to the problem presented for decision, it is necessary to review briefly the development of the autonomous group in America, culminating in the recognition by the Legislature of this group in 1945 and in 1948, as the successor to “ that group of churches, cathedrals, chapels, congregations, societies, parishes, committees and other religious organizations of the Eastern Confession (Eastern Orthodox or Greek Catholic Church) which * * * were subject to the administrative jurisdiction of the Most Sacred Governing Synod in Moscow until on or about nineteen hundred seventeen, later the Patriarchate of Moscow, but now constitute an administratively autonomous metropolitan district created pursuant to resolutions adopted at a general convention (sobor) of said district held at Detroit, Michigan ” in 1924 (Religious Corporations Law, art. 5-C, § 105: enacted by L. 1945, ch. 693, as amd. by L. 1948, ch. 711).
From April 2 to April 4,'1924, clerical and lay delegates of parishes of the Russian Orthodox Church of North America met in convention at Detroit, Michigan, to consider how to free themselves from Russian secular domination. The acuteness of their problem arose from the Russian revolution’s character, and its impact upon the historical ties between Russian orthodox churches in America and the ecclesiastical governing bodies or officials in Russia. The situation was complicated by the connection which had existed between the czarist government and the Russian church. The St. Nicholas Cathedral building on 97th Street, in New York City, involved herein, was constructed in 1903, with money some of which was supplied by the then czarist Russian government and by the church in Russia.
The old regime in Russia gave way to a new one which did more than expect political reciprocity from churches. It militantly proclaimed that religion is merely the opium of the people, that the soul of man has no significance, and man himself none, except as merged in the State. So all-embracing are its claims, that it does not tolerate literature, art, music, science or religion except in complete subordination to and in the service of ends of the Soviet state. The office of Patriarch was restored in 1917, but that important church dignitary, however much against his will, became a creature of the Soviet government. “ Tliereffis no doubt,” said one of the delegates at the 1924 Detroit convention, “ that we all stand for the Patriarch. But do you know that he would be thankful to us if we separated from him? By such an act we would relieve his heavy cross.”
*326 The delegates to this Detroit convention of 1924, recognized their underlying spiritual kinship with their Russian brethren, voted “ Not to break at all the spiritual ties and communion with the Russian church, but always to pray for her good, give her every co-operation and mention the Most Holy Patriarch as the head of the Russian Mother Church to which the American church is obligated for her existence ”, and they looked forward to a time when the relationship between the Russian and the American churches might be ordered by an oecumenical council of the entire Russian Orthodox Church “ with the participation of representatives of the American Church under conditions of political freedom, guaranteeing the fullness and authority or its decisions for the entire church ”; but this convention resolved, nevertheless, “ temporarily ”, until such a council could be convened, “ to declare the Russian Orthodox Diocese in America a self-governed Church so that it be governed by its own elected Archbishop by means of a Sobor of Bishops, a Council composed of those elected from the clergy and laity, and periodic Sobors of the entire American Church.” A procedure was authorized to establish “ a new constitution of the American Church.”
The use of the word “ temporarily ” is shown by the context to mean until, and not before, the dictatorship of the proletariat withers away, to an extent necessary to enable an oecumenical council to be held at which representatives of the American church can participate under conditions of political freedom.
The context shows that the mention of the Patriarch as the head of the Russian mother church, to which the majority opinion ascribes so much importance, was an expression of the reverence which the devout churchman has for the priestly office, that exists without relation to the conduct of the man who holds it. It is not clear by what reasoning it can be argued that in revering the office of Patriarch, these American delegates were sacrificing the independence which they were at pains to assert as an essential condition of any rapprochement, nor that they were surrendering their well-founded contention that the official acts of the Patriarch are controlled by the Soviet state. No one is concerned with attacking the character of Patriarch Alexi for yielding to the demands of the Russian dictatorship, nor in praising him for casuistry in so doing. The determining fact, which stands out above everything else in the record, is that if Patriarch Alexi did not administer the Russian church so as best to promote the spread of atheistic world communism, in the judgment of the Russian chiefs of state, he would quickly have been *327 superseded by another who would have done so. If the directives of such an official are to be binding upon the traditional branch of the Russian church in America, it has a just grievance.
A constitution was prepared and adopted by the autonomous Russian church in America, and at a convention held in Cleveland, Ohio, November 20 to 23, 1934, Archbishop Theophilus Pashkovsky was elected metropolitan, and certain so-called normal statutes for parishes were adopted. If plaintiff-appellant is successful in this action, Archbishop Theophilus will conduct the religious services in the cathedral as metropolitan, as the duly selected head of the Russian Orthodox Church in North America.
In 1935, the Moscow Patriarchate issued a decree suspending Metropolitan Theophilus, and purporting to prohibit him from performing divine service “ until either he repents or the ecclesiastical court shall have rendered a decision.” The Patriarchate of Moscow had previously declared null and void the proclamation of the autonomous nature of the North American diocese, which was described as “an act rudely violating Church Discipline ”. Defendant-respondent Archbishop Benjamin Fedchenkoff was proclaimed by Moscow “ as permanent Ruling Bishop of the Russian North American Diocese with the title of Archbishop of the Aleutian Islands and North America, also reserving to him the status of Exarch of the Moscow Patriarchate in America, and also granting to him the right to wear the cross on his Klobuk; to accept with recognition as such.”
Thus, the outcome of this case involves more than whether Archbishop Theophilus shall conduct the services in the cathedral: on it depends whether the communicants of the Russian church in America who refuse to submit to Soviet overlordship, shall within our jurisdiction have the use of the church buildings, revenues and other temporalities of their traditional church.
It is unnecessary further to detail the efforts of the American branch of the Russian church to establish its administratively autonomous status, as shown by the record, nor to outline the particular steps by which the Soviet government has pursued the policy of seizing the machinery of religion in order to control the minds of men. As phrased in the dignified statement of the American delegates, who vainly sought to achieve a modus vivendi on their mission to Moscow in January 1945: “ It was no fault of the American branch of the Russian Orthodox Church *328 that by force of circumstances it was compelled to establish its own church administration. It was no fault of the American Church that the Patriarchate laid a suspension on it because its clergy declined to give a pledge of loyalty to the Soviet power.”
Respondents’ position is lucidly and briefly stated in the motion by respondents’ counsel to dismiss the complaint at the close of plaintiff’s evidence at pages 268-270 of the record, and in the resumé of the Gregory Tchukov testimony at pages 271-278.
The grounds that plaintiff cannot maintain an action for ejectment, and that this action is barred by the Statute of Limitations or laches, do not require comment. The decision of the Trial Term is not based upon them, and they are effectually answered in appellant’s brief. The important ground, upon which the decision of the case was made at Trial Term, is that plaintiff holds title to the St. Nicholas Cathedral properties on 97th Street, as trustee for the duly accredited archbishop appointed by the supreme church authorities in Russia, and that the case of Kedrovsky v. Rojdesvensky (214 App. Div. 483, affd. without opinion 242 N. Y. 547) held that an archbishop appointed by such authorities is the only person who has the right to possess, occupy and use that cathedral.
The Tchukov testimony is that as a result of enactments of a general convention (sobor) in Russia in 1917-1918, the Patriarch and the Holy Synod, of which the Patriarch is the head, are the supreme authority of the Russian church, that the American branch of the Russian church is a diocese of the Russian Orthodox Church, and is ruled by an archbishop appointed by the supreme church authority, which may suspend or remove such archbishop and appoint another in his place at its pleasure. He further stated that canon law, and the rules and usages of the Russian Orthodox Church, do not permit any diocese or any subdivision or constituent part of the djurch, for any reason whatsoever, to secede from or declare itself independent of the main branch of the church at large, or declare itself autonomous or a self-governing body or district. He testified that the action of the group of Russian orthodox churches in America, and the resolutions adopted by them in the convention in Detroit of 1924, and the purported election of the predecessor of Archbishop Theophilus as the archbishop of said churches violates these canons, rules and usages, and specifically he added: “ Saint Nicholas Cathedral, in accordance with the rules and usages of the Russian Orthodox Church, must be possessed, occupied, *329 and used by the Archbishop of the American Archdiocese, who is duly appointed by the Supreme Church Authority, above referred to, namely, the Patriarch and the Holy Synod, and said Cathedral may not be occupied by any other official or person.”
If this position, upheld by the trial court, be correct, it means that the courts and the Legislature are powerless to accord to these American communicants of the Russian church the use of their accustomed church buildings, and other temporalities, unless they submit to the high church authorities in Russia, who are captive to the Soviet Government. We think that this would be exalting form above substance.
In reversing the judgment appealed from and deciding in favor of the plaintiff as the representative of the autonomous Russian church in America, there would be no conflict with the rulings in Watson v. Jones (13 Wall. [U. S.] 679, supra) or Trustees of Presbytery v. Westminster Church (222 N. Y. 305). Those cases hold, as section 5 of the Religious Corporations Law declares, that the “ temporalities and property, real and personal,” belonging to a religious corporation are to be administered ‘ ‘ in accordance with the discipline, rules and usages of the corporation and of the ecclesiastical governing body, if any, to which the corporation is subject, and with the provisions of law relating thereto ”.
It is readily conceded that the rule no longer obtains in New York State that a religious corporation holds its temporalities free from regulation by any ecclesiastical authority, or by a tenure so independent that it could change its creed or denominational character without losing its hold upon its property (Westminster Church v. Presbytery of New York, 211 N. Y. 214).
Respondents are also correct in asserting that it was formerly the practice in the Russian Orthodox Church in America for its archbishops and bishops to be subject to administrative control by some higher church authority, although the composition of such authority has changed from time to. time, as when the office of Patriarch was abolished in 1700 and so remained for two centuries until it was restored in 1917.
The essential point on which we consider that the trial court erred, and on which we differ with the majority of this court, is the failure to recognize that approval or direction by the high church authorities in Russia has lost all canonical significance, while those authorities have been deprived of their freedom of action. It is as though they were constantly, and in all things, subject to duress, and subjected to duress by a govern *330 ment founded upon principles inimical to the existence of any Christian church. Their action or inaction is, therefore, nugatory.
“ ‘ Duress exists,’ says Judge Cooley, ‘ when one, by the unlawful act of another, is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will.’ Hackley v. Headley, 45 Mich. 569, 574, 8 N. W. 511. Duress by the government or its officers, in this class of cases, is defined by the supreme court as ‘ moral duress not justified by law.’ Maxwell v. Griswold, 10 How. 242, 256,13 L. Ed. 405. It must be the pressure arising from unlawful acts or demands on the part of the government or its officers to produce that constraint of will or action, or state of necessity or compulsion, which render acts voluntary in form involuntary and void.” (Newburyport Water Co. v. City of Newburyport, 103 F. 584, 594.)
Under conditions existing today, it would be an idle ceremony, void of all religious or ecclesiastical meaning), to call for approval by the so-called supreme church authorities in Bussia of the selection of an archbishop to preside over the American branch of the Bussian church. The only theory on which such an act could signify anything, would be that the Bussian Government is exercising a lawful function in utilizing the machinery of church organizations, however deviously, to promote worship of the Bussian state and its leaders. We cannot recognize the validity of such a procedure, especially where the purpose is clearly to use the Bussian Orthodox Church in America as an instrument of foreign Soviet propaganda here. That such conduct, offensive to our public policy, has been engaged in by a government recognized by the United States, affords no reason why it should be upheld in our courts (Vladikavkazsky Ry. Co. v. New York Trust Co., 263 N. Y. 369, 378-379, citing Baglin v. Cusenier, 221 U. S. 580). This is in accordance with declarations of public policy by the State Department of the United States. In recent public pronouncements the State Department, and our representatives in the United Nations, have frequently recognized and denounced the suppression of human rights and basic liberties in religion as well as in other aspects of life, existing in Soviet Bussia and in all of its satellite states. The President of the United States has publicly characterized such efforts as a campaign to turn religion into a tool of the state (Armistice Day Address, November 11,1949).
*331 Even the intellectual and spiritual ties by which men are held together, are so controlled by the totalitarian state as ultimately to disintegrate all autonomous groups outside of the state itself, or the single political party that rules it. That technique is applied to scientific and cultural as well as to religious groups, so that ultimately no autonomous group with any independence remains. In the final analysis, the state and the state alone becomes all. It involves a retreat from reality if we do not clearly see that. In this case the technique of suppression, and the attempted use of a religious group merely as an instrumentality to serve the all-embracing and dominant ends of the Soviet state, is the real issue presented. The so-called “ Russian church at large ”, so frequently mentioned by respondents, is in reality and unfortunately the Russian church group whose high ranking functionaries have been completely subjected and dominated by the men who control the Politburo, and the relatively small group that constitutes ‘ ‘ the party ’ ’, through whom the vast millions in Russia and Soviet-dominated satellite countries are regimented and controlled.
The case of Kedrovsky v. Rojdesvensky (214 App. Div. 483, affd. without opinion 242 N. Y. 547, supra) has mistakenly been regarded as controlling. In that case, it is true, the same group now represented by plaintiff was defeated, and the representatives of a group styled as the “ Living Church ”, “ Renovated Church ” or “ Soviet Church ”, were held entitled to this cathedral. As a result of that decision, Archbishop Kedrovsky occupied it until his death in 1934, and his son, the defendant John Kedroff, remained there until his retirement ten years later. Archbishop Benjamin Fedchenkoff, whose right to occupation of the cathedral is confirmed by the judgment appealed from, does not claim through Kedrovsky, nor through his son, the defendant John Kedroff. Respondents in this case concede that Archbishop Kedrovsky’s appointment was uncanonical, and that the group represented by him had no standing and is now extinct. Thus, in the testimony of Tchukov, it is stated concerning the 1923 convention (sobor) in Russia, from which Kedrovsky derived his supposed canonical status: “ This sobor is not regarded as having met with canonical requirements because it was not called by the Patriarch and the Holy Synod. However, within a few years thereafter, these Church movements subsided and practically all of the leaders, adherents and parishes of this Church joined with and were absorbed by the Patriarchal Church.” He also stated that the resolutions *332 of this sohor “ shortly became a dead letter,” and “ that the constituent parties of the Sobor of 1923 shortly died out and the Patriarchal Church functioned effectively and without restraint.”
When the case of Kedrovsky v. Rojdesvensky (214 App. Div. 483, affd. 242 N. Y. 547, supra) was in the courts, it evidently did not suit the purposes of the ruling power in Russia to furnish evidence to establish the lack of canonicity of the group which succeeded in that lawsuit. That circumstance should result in scepticism concerning the present assertion, that since the extinction of the winning faction in that action “ the Patriarchal Church functioned effectively and without restraint. ’ ’ As stated by Lord Mansfield in Blatch v. Archer (Cowp. 66): “It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other to have contradicted ” (quoted in 2 Wigmore on Evidence, § 285, p. 163). It does not exceed the limits of judicial notice to recognize that in this action defendant Benjamin Fedchenkoff, like Kedrovsky in the prior action, had access in Russia to whatever helpful documentary or other evidence respondents needed, whereas the door to obtaining similar proof in plaintiff’s behalf was undoubtedly closed, as it was to Archbishop Platon in the prior case. Were it to suit the purposes of the ruling caste in Russia at some future time to disavow the authority of Archbishop Benjamin, there is little doubt that the lack of it could be demonstrated as effectively as has been accomplished in the case 'of Archbishop Kedrovsky, who appeared to possess the tokens of investiture when he was in court a quarter of a century ago.
Nevertheless, it is urged, and has been held, that the Kedrovshy case controls, on the theory that it established that whoever is to be the rightful incumbent of St. Nicholas Cathedral, must have obtained the approval of the Patriarch and Holy Synod in Russia.
In considering the Kedrovshy case, decided in 1925, it should be borne in mind that the relationship of the Russian Government to churches was not and could not have been widely known, to the extent that has since been manifested in Russia and its satellite countries. The situation has become so obvious and acute that, since the Kedrovshy case was decided, the Legislature has recognized the administratively autonomous group established at the 1924 Detroit convention, and subsequent conventions, as being the traditional branch of the Russian Church in America. If Kedrovsky v. Rojdesvensky were otherwise *333 held to be controlling, its effect would have been overcome by these acts of the Legislature. Article 5-C was added to the Religious Corporations Law by chapter 693 of the Laws of 1945, and amended by chapter 711 of the Laws of 1948. The amendment, effective March 31, 1948, was evidently intended to interpret rather than to change the content of the 1945 act (People ex rel. Westchester Fire Ins. Co. v. Davenport, 91 N. Y. 574; Sutherland on Statutory Construction [3d ed.], § 1931, p. 418), and is of special interest since it became law after the decision was rendered herein by Trial Term, and interprets the 1945 statute otherwise than as it was construed in Trial Term’s opinion, as is pointed out hereafter.
In analyzing these statutes, it should be recollected that the purpose of the Religious Corporations Law is to deal with the temporalities of religious societies, and to insure that they will be administered for the benefit of the societies for which they have been dedicated (Walker Memorial Baptist Church v. Saunders, 285 N. Y. 462, 472; Watson v. Jones, 13 Wall. [U. S.] 679, supra). There is no attempt by the State, acting either through the Legislature or the courts, to enter into matters of doctrine or ecclesiastical law, except only insofar as necessary to the administration of real or personal property. In Watson v. Jones, in discussing controversies arising in the civil courts concerning property rights of religious societies, in an often quoted statement, the Supreme Court said (p. 727): “ In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.”
This principle is embodied in section 5 of the same chapter of the Consolidated Laws to which article 5-C of the Religious Corporations Law was added in 1945 and 1948.
The Legislature undoubtedly bore this principle in mind when in enacting article 5-C it declared the autonomous group represented by this plaintiff, to be the true successor and representative in America of the Russian branch of the Eastern Orthodox or Greek Catholic Church, and therefore entitled to “ the custody and control of all temporalities and property, real and per *334 sonal, belonging to such church and of the revenues therefrom * * * ” (Religious Corporations Law, § 107, subd. 3). When article 5-C was added, at least four fifths of the parishes in the United States had joined the autonomous group, and declared themselves administratively independent of Moscow. They had firmly and convincingly avowed that the Synod and the Patriarch had lost their freedom of action, and that their ostensible administrative acts were therefore not their own. They had become puppets. It was within the competence of the Legislature, as it would be within that of the courts in the absence of legislation, in searching for the “ church judicatories ” mentioned in Watson v. Jones, whose decisions on questions of ecclesiastical rule are to be final, to determine that the higher church authorities in Moscow have become a phantom, a mere semblance having the form but not the substance of organs of the orthodox eastern church, and that while under such duress their action may be treated as void or superfluous. The Legislature has expressly determined that, in this instance, the church judicatories whose determinations are to be followed, are the Detroit and Cleveland conventions of 1924 and 1934 and the New York convention of 1937.
The case of Watson v. Jones involved a decision in a Presbyterian parish in Kentucky over the question of slavery at the time of the Civil War. It was held that the independent faction in that parish was subject to the Presbytery, Synod and General Assembly of the Presbyterian Church in the United States even though it disagreed on the question of slavery. There was no such factor in that case, as in this, that the organs of the general church had ceased to have anything but a formal ecclesiastical existence of their own, and had been in reality merged in an atheistic state. To regard the high church functionaries in Russia as having administrative freedom independent of the Russian government, is as unwarranted as it would be to attempt to distinguish between the Russian state and any other communist front.
The extended narration of the history of the Russian church in America contained in section 105 of article 5-C of the Religious Corporations Law, appears to have been inserted in order to leave no room for dispute that the 11 group of churches, cathedrals, chapels, congregations, societies, parishes, committees and other religious organizations of the Eastern Confession (Eastern Orthodox or Greek Catholic Church) ” which had been known historically by various names, enumerated in the statute, including that of “ Diocese of North America and *335 the Aleutian Islands ”, and which “ were subject to the administrative jurisdiction of the Most Sacred Governing Synod in Moscow until in or about nineteen hundred seventeen, later the Patriarchate of Moscow ” do “ now constitute an administratively autonomous metropolitan district created pursuant to resolutions adopted at a general convention (sobor) of said district held at Detroit, Michigan, on or about or between April second to fourth, nineteen hundred twenty-four.” (Emphasis supplied.)
The structure of this statute is not such as to provide for the incorporation of new parishes in a new religious denomination, as the majority opinion indicates, without reference to the Russian Orthodox Church as previously organized in America. This statute gives civil recognition to the action taken at the Detroit sobor in 1924, which was not concerned with organizing new parishes but in severing the old ones from control by Moscow. In plain language it describes the Russian Orthodox Church, identifying it by all the names under which it had been known historically in this hemisphere since 1793, and then declares that this same church organization in America which was previously subject to control by the central church authorities in Moscow shall be so no longer, but shall constitute an administratively autonomous district to be known as the ‘ ‘ Russian Church in America ’ ’, erected by conventions held in the United States. Neither do we think that such a clearly stated intent on the part of the Legislature in 1945 and 1948, to act in respect of this very situation, should be nullified for the reason that in 1943 a minor amendment was passed to an old section of the Religious Corporations Law affecting the powers of trustees of the four orthodox Creek catholic primary jurisdictions in America — Constantinople, Antioch, Serbia and Moscow (L. 1943, ch. 145, § 1, amdg. Religious Corporations Law, § 15, subd. 3), nor for the reason that in the same year (1943) a new article was added (art. 15) providing for incorporation of parishes of churches subject to any of said four primary jurisdictions. In any event, the 1945 and 1948 legislation, applying to this particular situation, should be held to control over the former more general enactments and, if necessary, to have repealed them pro tanto (Strauch v. Town of Oyster Bay, 263 App. Div. 833; Wood v. Wellington, 30 N. Y. 218).
Subdivision 1 of section 107 of article 5-0 provides that every orthodox church in this State shall recognize and be and remain subject to the administrative authority of the governing bodies *336 and officials of “ the Russian Church in America, pursuant to the statutes for the government thereof adopted at a general convention" (sohor) held in the city of New York on or about or between October fifth to eighth, nineteen hundred thirty-seven, and any amendments thereto and any other statutes or rules heretofore or hereafter adopted by a general convention (sobor) of the Russian Church in America and shall in all other respects conform to, maintain and follow the faith, doctrine, ritual, communion, discipline, canon law, traditions and usages of the Eastern Confession (Eastern Orthodox or G-reek Catholic Church).”
Subdivision 3 of section 107 provides for the further administration of the temporalities in accordance with church by-laws, and of the statutes for parishes of the Russian church in America approved at a general convention thereof held at Cleveland, Ohio, from November 20 to 23, 1934, and any amendments thereto and all other rules, statutes, regulations and usages of the Russian church in America. The Cleveland convention, held on the dates specified in this statute, was the one which named Archbishop Theophilus Pashkovsky to preside over the Russian church in America, who will occupy St. Nicholas Cathedral if plaintiff succeeds.
Trial Term took, as we think, too restricted a view of article 5-C of the Religious Corporations Law, in holding it “ applicable only to Russian Orthodox churches which might thereafter be organized (§ 106) or which, having theretofore been incorporated, should thereafter be reincorporated (§ 108)”, and in holding that “ Since St. Nicholas Cathedral falls within neither of these categories, it follows that its use is not subject to the direction of the Russian Church in America.” (P. 333.) After Trial Term’s decision, article 5-C of the Religious Corporations Law was amended, not only so as to insert the word “ administrative ” to characterize the independence from Moscow of the American body, but also so as to define the application of article 5-C (§ 107) to “ Every Russian Orthodox church in this state, whether incorporated before or after the creation of said autonomous metropolitan district, and whether incorporated ox reincorporated pursuant to this article or any other article of the religious corporations law, or any general or private law.” (Emphasis supplied.) This language was not intended to limit the application of article 5-C to churches thereafter incorporated or reincorporated under that article. Plaintiff was incorporated by a private law known as chapter 463 of the Laws of 1925, and *337 its corporate existence was confirmed, moreover, by chapter 817 of the Laws of 1945, by the same Legislature which added article 5-C to the Religious Corporations Law. We think that article 5-C, particularly as it was amended and construed by chapter 711 of the Laws of 1948, was intended to relate to plaintiff, and to direct the courts by what authority the temporalities of the Russian church in America are to be administered.
In order to accomplish its purpose, this act need not be an expropriation statute, such as that which deprived the Mormon Church in Utah of property which was subsequently,used for common schools (Mormon Church v. United States, 136 U. S. 1), nor must it involve what Trial Term further described as “ a transfer of property of all Russian Orthodox Churches in this country to the use of the newly recognized ‘ Russian Church in America ’ ” (emphasis supplied). (Pp. 332-333.) All that was intended by these statutes, being all that was necessary to the end in view, was to determine that the Russian church in America, as defined in these acts, is the traditional Russian Orthodox Church on this continent, that the communicants are legally entitled to worship in the same buildings and have the use and revenues of the other temporalities which they had previously enjoyed, that they are not to be put out or kept out of possession upon directions emanating in reality from the Kremlin, and that the Synod and the Patriarch in Moscow are to be regarded as having no present functional existence apart from the Soviet Government. The Legislature recognized the Detroit convention of 1924, and subsequent conventions in this country, declaring the autonomous Russian Church in America to be the same religious society which had previously been known in this country by the other names which had been borne here by the Russian branch of the Eastern Orthodox or Greek Catholic Church.
A statute does not infringe the constitutional guarantee of religious liberty nor the separation of church and state, which provides for a decent separation here betwéen the church and the Russian state. Statutes are presumptively constitutional (Matter of Buoneto v. Buoneto, 278 N. Y. 284), and the constitutionality of article 5-C of the Religious Corporations Law is not subject to attack if the administrative acts of the Russian central church authority are controlled by an antireligious dictatorship. Nothing in the cases of Watson v. Jones or Trustees of Presbytery v. Westminster Church holds that the State, acting through courts or Legislature, cannot trace and identify under changed circumstances the religious society for whose benefit *338 temporalities have been dedicated. Legislatures and courts have more than once been called upon to ascertain what has become of the group which the founders meant to endow, to identify it behind a changed facade, or to decide by cy pres what is the religious society that most nearly resembles the original if the latter has become extinct or altered beyond recognition. Construed as a legislative ascertainment under conditions now existing in the world, of the organized religious society for whose use the temporalities here in question had been dedicated, no question of constitutionality arises. Traditional Russian orthodox parishes in the United States have declared, in effect, that they are, and as of right ought to be, free from administrative control by an aggressively atheistic Russian state. The Legislature has merely confirmed the existence of this well-known fact, and has not caused any deprivation of property without due process of law, nor interfered with religious liberty. On the contrary, it has provided for the enjoyment of this property by its accustomed beneficiaries.
The majority of this court professes to be in ignorance concerning whether the domination of the central church authorities by the Russian state is really a fact, and rebukes the minority for being guided in this matter ‘ ‘ on suspicion or news reports; we act only on legal proof.” The record contains proof on the point; but even if it did not, the wise rule was thus expressed by Lord Coleridge in Lumley v. Guy (2 El. & Bl. 266, quoted in 9 Wigmore on Evidence, § 2583, note): “ Judges are not necessarily to be ignorant in Court of what everybody else, and they themselves out of Court, are familiar with; nor was that unreal ignorance considered to be an attribute of the Bench in early and strict times.”
In Nankivel v. Omsk All Russian Government (237 N. Y. 150, 156) notice was taken that recent Russian history in considerable detail is a matter of common knowledge. In 15 Ruling Case Law (Judicial Notice, § 28, p. 1093) it is stated that “ Matters of religious history are deemed to be subjects of common knowledge and therefore of judicial notice,” which is also said to be taken of “ the general current of human affairs, which rest entirely upon acknowledged notoriety for their claims to judicial recognition.” (§ 1.)
Moreover, the constitutionality of article 5-C is to be presumed, and, if it depends upon the domination of the Russian central church authorities by the Soviet state, the Legislature is deemed to have found that as a fact, and the burden is cast *339 upon those who are attacking the constitutionality to establish that the fact is otherwise. In O’Gorman & Young v. Hartford Ins. Co. (282 U. S. 251, 257-258) it was said: “ As underlying questions of fact may condition the constitutionality of legislation of this character, the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute.” In Powell v. Pennsylvania (127 U. S. 678, 685) the court stated: “ And as it does not appear upon the face of the statute, or from any facts of which the court must take judicial cognizance, that it infringes rights secured by the fundamental law, the legislative determination of those questions is conclusive upon the courts.” In People v. Lochner (177 N. Y. 145,169) it was stated in a concurring opinion by Vault, J., on a question of constitutionality: “ Necessarily in considering the subject we may resort to such sources of information as were open to the legislature.” Again in Noyes v. Erie & Wyoming Farmers Co-op. Corp. (281N. Y. 187,195) the rule was declared: “ But a known state of facts warranting legislative action is presumed * * In 8sold v. Outlet Embroidery Supply Co. (274 N. Y. 271, 278) it was stated in an opinion, per Loitghralt, J., in considering an assertion of facts which would impair the constitutionality of a statute: “We think the assertion is without support in the ordinary data of human experience, but if we are not supposed to know this to be so, then the presumption is that the Legislature inquired and found the need * * *.”
In view of the statutory enactment in this State determining that the autonomous group with which plaintiff is affiliated is the successor to the American branch of the Russian Orthodox Church, entitled to the control and administration of its properties, we are required to assume that the Legislature examined into the question and determined that the central church authorities in Moscow function in reality as a department of the Russian State. The majority opinion toward the end suggests that if and when the Russian Orthodox Church no longer exists in Russia, or “ if and when the Legislature of this state may make appropriate disposition of property within this state found to be subject to its control and disposition, our courts may take other action. Thus far we find no declaration by the Legislature and no proof offered to this court that the trust purposes for which plaintiff holds the cathedral have been extinguished or terminated. ’ ’ This statement fails to consider that, under the cases above cited, it was not necessary for the Legislature in enacting *340 article 5-C to enumerate specifically the facts conditioning its validity, hut that the existence of such facts would he presumed. Among the facts which the Legislature is deemed to have found are a Patriarch and Synod in Moscow dominated, directed and controlled by a totalitarian atheistic regime. If it is to be decided that the trust purposes for which plaintiff holds the cathedral require that any Christian society shall submit to adminstrative control by such authority, it is difficult to conceive what more aggravated circumstances could exist that would call for legislative or court action to overrule the conclusion reached by the majority herein.
It is said that there have been instances in history where a church or sect has been subject to varying degrees of political control or domination without drawing in question its functional existence. It is probable that history has never known such refined techniques, whether based upon subtle psychology of propaganda or the ruthless use of brute force, for coercing body, mind and spirit as those which have been developed with the aid of modern science, and used so effectively by totalitarian countries in the present era. A venerable church, widely respected, can be transformed into a powerful engine for the exercise of such coercion and control. That objective could not be reached except by making use of ecclesiastical forms, but the fact that these are to some extent left undisturbed indicates only that by doing so the church can more effectively be used for political opportunism, and not that there is any real area of freedom for church functionaries. It has been the unmistakable purpose of the Soviet Government to prostitute historical churches to that end, and where highly placed clerics have been bent to the will of that government, reason dictates that their utterances should not be regarded as the official expression of their communions but as the voice of the Politburo.
The point is not whether the Soviet Government will succeed in annihilating all religion except worship of the Eussian state; it is, rather, that our law does not require us to assist in the process, so far as churches in America are concerned, by sustaining the eviction of their communicants and compelling them to find other places of worship, unless they submit to administrative direction by top level church officials who would not be permitted to function, unless they consented to the use of their powers to promote the advancement of atheistic world communism. It is not believed that the purposes of the present regime have been substantially altered, as thus expressed in a *341 statement by Josef Stalin in Ms conversation "with members of the First American Trade Union Delegation September 9, 1927, as set forth at pages 345-346 of this record: “ The Party cannot be neutral with regard to religion, and it conducts anti-religious propaganda against any and all religious prejudices because it stands for science, while religious prejudices go against science, since every religion is sometMng contrary to science. * * * The Party cannot be neutral with regard to the bearers of religious prejudices, with regard to the reactionary clergy, poisoning the minds of the toiling masses. Have we oppressed the reactionary clergy? Yes, we have oppressed them. The trouble is only that they are not yet fully liquidated. Antireligious propaganda is the means which must carry through to the end the work of liquidating the reactionary clergy.” Whatever tMs statement may signify in respect to science, it is an expression of uncompromising and rutHess hostility toward Christianity. The Roman emperors Nero and Trajan also persecuted the Christians, but they were not in the anomalous position of attempting to be at the same time in actual charge of the administration of the Christian church.
The Orthodox Eastern or Greek Catholic Church, in its origin, was affected to a greater degree by the civil power exerted through the eastern empire, than was true in the west. It appears to be true enough that the czars, professing Christians, like the Emperor JustiMan before them, frequently ruled the church in important respects. On the other hand, there were periods when the civil power was weak, when the Russian church became the chief permanent institution of the Russian nation, and the patriarch of Moscow stood out as the visible center of unity (Adeney on The Greek & Eastern Churches [Scribner’s, 1908], pp. 406-407).
The church in the east never had the cohesion of the Roman Catholic church, and after Justinian’s empire disintegrated, the church-state relationships made the rising forces of nationalism tend to eliminate central authority, and to divide the Orthodox Eastern Church along nationalist lines. TMs is said to have resulted in the establishment of about seventeen autonomous Orthodox Eastern churches (see Columbia Encyclopedia [1946 ed.], tit. “ Orthodox Eastern Church ”, p. 1314). The Russian Orthodox Church itself was formed by breaMng away from the Patriarch of Constantinople, after he became subject to the “ infidels ” — to a lesser degree, however, than in Russia today — upon the fall of Constantinople to the Turks at the end *342 of the Middle Ages in 1453. This, says a leading historian (Adeney, p. 392), had the immediate consequence of gaining ecclesiastical independence for the Russian church, resulting in the election of the metropolitan of Moscow by a council of Russian bishops instead of his being appointed by the Patriarch of Constantinople. There was no doctrinal schism. Even when express recognition finally was wrested from the enfeebled Patriarch in 1589, and the office of Patriarch of Moscow was set up, there was grave doubt among formalists concerning the power of the Patriarch of Constantinople to do this without the approval of an oecumenical council and, furthermore, there was no ceremony of investiture. The latter was withheld as a concession to the Byzantine Creeks, who were thus enabled to adhere to the view that the Russian church was uncanonical and void (Janin on The Separated Eastern Churches [Sands & Co., London, 1933], pp. 94-95; Adeney, op. cit., p. 392, et seq.). “ But ”, continues the latter author, “ beyond this accession of dignity the patriarch of Moscow had acquired no more real power than had been secured already by the metropolitan.” (P. 406.)
The autonomous Russian church in America is following a similar course today. The headquarters has not been in Russia for 900 years, but was in Constantinople until the Patriarch of Constantinople fell into the hands of the Turks. That created a situation which was as intolerable for the churches in Russia as the autonomous group in America are finding it today, now that the Patriarch of Moscow has fallen into the power of modern infidels. Until then there was no Patriarch of Moscow, who was brought into being by this earlier historical parallel. The fiduciary principle, on which the outcome of this case depends, can hardly be so inelastic as to require that a Christian religious society must submit to the dictates of either militant atheism or militant Mohammedanism in order to continue to possess its property.
In the case of an established national church, it is inevitable that foreign branches will become autonomous where the mother country insists upon using it as an instrument of national policy. An illustration of judicial recognition that the tides of history are not to be confined by legal fictions, is found in the holding that the Episcopal Church in America ceased to be subject to control by the Archbishop of Canterbury after the American Revolution (Sohier v. Trinity Church, 109 Mass. 1, 20; Zollman on American Civil Church Law [Columbia Uni *343 versity, 1917], pp. 161-162), notwithstanding that the “ establishment ” of the Anglican Church in England involved no such absorption of the church into the state as exists in Russia, that the cultural and traditional backgrounds of the two countries were homogeneous, and that the beliefs and ecclesiastical practices of those two denominations were almost identical.
An appeal to history tends to result in confirmation of the legal position of the autonomous Russian church in America as successor to the branch of the Russian Orthodox Church on this continent, and in the conclusion that the Legislature has acted within the historical pattern of the Orthodox Eastern Church in accordance with which the church in Russia itself was established.
In these latter days there have been declarations by high ecclesiastics, before being arrested in communist countries, to disregard whatever they may afterward say. The human being cannot always forecast what he will say or do when subjected to extremes of physical or mental torture. Religious leaders have sometimes found it possible to be foresighted enough to delegate their authority in anticipation of such catastrophies. The Russian high church authorities in recent times endeavored to do so in event of dioceses cut off from Moscow by “ military movements ”. The Patriarch and Holy Synod, while they still enjoyed some freedom of action, were not farsighted enough* expressly to delegate power to branches of the Russian Orthodox Church beyond the reach of Soviet control, in anticipation of absorption of the central authority into the Russian state. There is indication in this record that Patriarch Tikhon, had he known what was to come, might have done something of that kind. His hand appears to have been forced, however, and he died in 1925. There is no reason to believe that Patriarch Alexi could have been appointed or continue to hold office if he were not a willing tool of the Kremlin.
If express delegation of authority in advance is indispensable, it would appear to he a postulate of that principle, that if the central church authority in Russia had been prevented from functioning by German military occupation during World War II, the American and other foreign branches of the Russian Orthodox Church could not have operated outside of the orbit of the captured central authority, except as the latter had previously authorized them to do so. The German invaders, if Moscow had fallen, could, in the absence of that formality, have been masters of the Orthodox Russian Church throughout *344 the world. If this be true, it behooves every church organization within striking range of Soviet power to discern the pattern of the future — whatever that may be — and to delegate authority accurately in anticipation of all contingencies, since otherwise under the majority ruling herein whoever seizes the central organs of authority will have de jure control of the functioning of the entire religious society wherever situated.
In ecclesiastical as well as in legal thinking, there is a well-grounded professional instinct that lines of authority should be rendered explicit, but it seems to be a reductio ad absurdum to regard the absence of such anticipatory express delegations as a warrant of power for usurpers of ecclesiastical rule. It is sound legal doctrine to treat as null and void the words and acts of persons or officials who have been deprived of their freedom of action. Nor should the historical Russian church in the United States be held to have disintegrated, for the reason that the voluntary direction and consent of the Patriarch and the Holy Synod in Moscow are no longer obtainable. Expressly delegated lines of authority are desirable, but if they be always essential, a church communion would be in a sorry plight if its high officials, failing to read the future correctly, neglected to delegate administrative power, or did so in the wrong direction or to the wrong persons. Nice questions might arise, even then, of power to delegate power, and a vital church organism be strangled in legal technicalities.
The majority opinion states that we have misunderstood the controversy between these parties; the record shows that we have not misunderstood it, that there is a fundamental matter in difference, and of a type that is not likely to be settled until it is settled right.
The judgment appealed from should be reversed, with costs, and judgment entered awarding to the plaintiff possession of the real property described in the complaint, to be held by it subject to its acts of incorporation, by-laws and the statutes, regulations and usages of the Russian church in America described in article 5-0 of the Religious Corporations Law.
Cohet and Shieettag, JJ., concur with Callahaet, J.; Yaet Yoorhis, J., dissents and votes to reverse in an opinion in which Dore, J., concurs.
Judgment affirmed, with costs.